APPEAL,CLOSED,TYPE−C

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:26−cv−00861−ABJ

ARAGON et al v. ROLLINS et al
Assigned to: Judge Amy Berman Jackson
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 03/11/2026
Date Terminated: 06/26/2026
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NIEVES ARAGON** represented by

**Ellison Snider**
SHINDER CANTOR LERNER LLP
14 Penn Plaza
Ste 19th Floor
New York, NY 10122
646−960−8601
Email: esnider@scl−llp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Shinder**
SHINDER CANTOR LERNER LLP
14 Penn Plaza
Ste 19th Floor
New York, NY 10122
646−960−8602
Email: jeffrey@scl−llp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay R. Maher**
SHINDER CANTOR LERNER LLP
600 14th Street, NW
Ste 5th Floor
Washington, DC 20005
646−360−8601
Fax: 646−360−8625
Email: lmaher@scl−llp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ciara Wren Malone**
NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE

50 Broadway
Suite 1500
New York, NY 10004
646−680−8912
Email: malone@nclej.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katharine Deabler−Meadows**
NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE
50 Broadway
Suite 1500
New York, NY 10004
212−633−6967
Email: deabler@nclej.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meegan F Hollywood**
SHINDER CANTOR LERNER LLP
14 Penn Plaza
Ste 19th Floor
New York, NY 10122
646−960−8601
Fax: 646−960−8625
Email: meegan@scl−llp.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARC CRAIG** represented by **Ellison Snider**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Shinder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay R. Maher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ciara Wren Malone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katharine Deabler−Meadows**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meegan F Hollywood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATHAN FLEMING** represented by **Ellison Snider**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Shinder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay R. Maher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ciara Wren Malone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katharine Deabler−Meadows**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meegan F Hollywood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SARAH STARKS**
*also known as*
HUNTER STARKS

represented by **Ellison Snider**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Shinder**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay R. Maher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ciara Wren Malone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katharine Deabler−Meadows**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meegan F Hollywood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMANDA JOHNSON** represented by **Ellison Snider**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Shinder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay R. Maher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ciara Wren Malone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katharine Deabler−Meadows**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Meegan F Hollywood**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BROOKE ROLLINS**
*in her official capacity as Secretary of Agriculture*

represented by **Eitan Sirkovich**
DOJ−Civ
1100 L Street NW
Room 12310
Washington, DC 20005
585−694−1124
Email: eitan.r.sirkovich@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cesar Azrak**
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
202−305−0693
Email: cesar.e.azrak@usdoj.gov
*TERMINATED: 07/21/2026*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF AGRICULTURE**

represented by **Eitan Sirkovich**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cesar Azrak**
(See above for address)
*TERMINATED: 07/21/2026*
*ATTORNEY TO BE NOTICED*

**Amicus**

**FOUNDATION FOR GOVERNMENT ACCOUNTABILITY**

represented by **Jeffrey M. Harris**
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd.
Suite 700
Arlington, VA 22209
703−243−9423
Email: jeff@consovoymccarthy.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NEBRASKA** represented by **Cody S Barnett**
NEBRASKA ATTORNEY GENERAL'S OFFICE
1445 K Street
Ste 2115
Lincoln, NE 68508
402−471−6933
Email: cody.barnett@nebraska.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF IOWA**

**Amicus**

**STATE OF TENNESSEE**

**Amicus**

**STATE OF WEST VIRGINIA**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2026 | 1 | COMPLAINT against BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE ( Filing fee $ 405 receipt number ADCDC−12293615) filed by SARAH STARKS, NIEVES ARAGON, NATHAN FLEMING, MARC CRAIG. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(Hollywood, Meegan) (Entered: 03/11/2026) |
| 03/11/2026 | 2 | NOTICE of Appearance by Meegan F Hollywood on behalf of NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS (Hollywood, Meegan) (Entered: 03/11/2026) |
| 03/12/2026 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint,. The following error(s) need correction: No signature on Civil Cover Sheet. Please file the signed document using the event Errata. All filings must have an original signature or /s/ Attorney Name to represent an electronic signature of the filer. Noncompliance with LCvR 5.1(c). Please file a Notice of Errata stating the error and attach the corrected initiating pleading to include the name & full residence address of each party and file using the event Errata. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (znmw) (Entered: 03/12/2026) |
| 03/12/2026 | 3 | ERRATA *with Corrected Civil Cover Sheet* by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS re 1 Complaint,. (Attachments: # 1 Civil Cover Sheet Corrected Civil Cover Sheet)(Hollywood, Meegan) (Entered: 03/12/2026) |
| 03/16/2026 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint,. The following error(s) need correction: Noncompliance with LCvR 5.1(c). Please file a Notice of Errata |

| | | |
|---|---|---|
| | | stating the error and attach the corrected initiating pleading to include the name & full residence address of each party and file using the event Errata; alternatively, file under seal as a Sealed Document. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied. SECOND NOTICE. Continued non−compliance will result in an Order to Show Cause and/or dismissal of case.** (znmw) (Entered: 03/16/2026) |
| 03/16/2026 | 4 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Appendix Sealed Document, # 2 Appendix Proposed Order)(Hollywood, Meegan) (Entered: 03/16/2026) |
| 03/17/2026 | | Case Assigned to Judge Amy Berman Jackson. (znmw) (Entered: 03/17/2026) |
| 03/17/2026 | 5 | SUMMONS (4) Issued Electronically as to BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 03/17/2026) |
| 03/17/2026 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Ellison A. Snider, Filing fee $ 100, receipt number ADCDC−12304710. Fee Status: Fee Paid. by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS. (Attachments: # 1 Declaration Snider Declaration, # 2 Appendix Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Hollywood, Meegan) (Entered: 03/17/2026) |
| 03/17/2026 | 7 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Lindsay Maher, Filing fee $ 100, receipt number ADCDC−12304734. Fee Status: Fee Paid. by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS. (Attachments: # 1 Declaration Maher Declaration, # 2 Appendix Certificate of Good Standing, # 3 Appendix Proposed Order)(Hollywood, Meegan) (Entered: 03/17/2026) |
| 03/17/2026 | | MINUTE ORDER granting 4 plaintiffs' sealed motion for leave to file under seal. The Clerk of Court is hereby ORDERED to file UNDER SEAL plaintiffs' notice of residential addresses [4−1]. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/17/2026. (lcabj1) (Entered: 03/17/2026) |
| 03/17/2026 | 8 | SEALED DOCUMENT (Plaintiffs' Addresses) filed by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS. (This document is SEALED and only available to authorized persons.)(znmw) (Entered: 03/19/2026) |
| 03/19/2026 | | MINUTE ORDER granting 6 Motion for Leave of Ellison A. Snider to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Amy Berman Jackson on 3/19/2026. (lcem) (Entered: 03/19/2026) |
| 03/19/2026 | | MINUTE ORDER granting 7 Motion for Leave of Lindsay Maher to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Amy Berman |

| | | |
|---|---|---|
| | | Jackson on 3/19/2026. (lcem) (Entered: 03/19/2026) |
| 03/19/2026 | 9 | Emergency MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction *and Relief Pursuant to 5 USC 705* by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS. (Attachments: # 1 Memorandum in Support of Motion for TRO, Preliminary Injunction and Relief Pursuant to 5 USC 705, # 2 Declaration of N. Aragon, # 3 Declaration of M. Craig, # 4 Declaration of N. Fleming, # 5 Declaration of A. Johnson, # 6 Declaration of S. Starks a/ka H. Starks, # 7 Declaration of Meegan Hollywood, Esq., # 8 Exhibit Exs. 1−7, # 9 Exhibit Exs. 8−15, # 10 Text of Proposed Order, # 11 Certificate of Service)(Hollywood, Meegan) (Entered: 03/19/2026) |
| 03/19/2026 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeffrey I. Shinder, Filing fee $ 100, receipt number ADCDC−12309113. Fee Status: Fee Paid. by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS. (Attachments: # 1 Declaration of J. Shinder, # 2 Appendix Certificate of Good Standing, # 3 Text of Proposed Order)(Hollywood, Meegan) (Entered: 03/19/2026) |
| 03/19/2026 | 11 | NOTICE of Appearance by Eitan Sirkovich on behalf of All Defendants (Sirkovich, Eitan) (Entered: 03/19/2026) |
| 03/19/2026 | | MINUTE ORDER. It is hereby ORDERED that a telephonic scheduling conference on the record is set for March 20, 2026 at 11:00 AM. The Courtroom Deputy will provide the dial−in information by separate email. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/19/2026. (zdrf) (Entered: 03/19/2026) |
| 03/20/2026 | | Minute Entry for scheduling conference proceedings held on 3/20/2026 before Judge Amy Berman Jackson. Scheduling Order forthcoming via Chambers. (Court Reporter Bryan Wayne) (zdrf) (Entered: 03/20/2026) |
| 03/20/2026 | | MINUTE ORDER. Based on the Court's review of the pleadings filed to date and the statements of counsel during the scheduling conference held on March 20, 2026, and with the consent of the parties, the Court finds in its discretion pursuant to Fed. R. Civ. Proc. 65(a)(2) that it will be appropriate and a more efficient use of the Court's and the parties' resources to advance and consolidate the resolution of this case on the merits with the consideration of plaintiffs' pending motion 9 for a temporary restraining order and preliminary injunction. Therefore, it will deem plaintiffs' motion to be a motion for summary judgment, and the following schedule will govern the remainder of the briefing: defendants must docket the Administrative Record on or before April 3, 2026; defendants' opposition and cross−motion for summary judgment, supported by a single memorandum of points and authorities, will also be due on April 3; plaintiffs' reply in support of their motion and cross−opposition, supported by a single memorandum, will be due on April 15; and defendants' cross−reply will be due on April 22. The Court will hold a hearing on May 1, 2026 at 10:00 a.m. in Courtroom 25. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/20/2026. (lcabj1) (Entered: 03/20/2026) |
| 03/20/2026 | | MINUTE ORDER. It is ORDERED that, due to a conflict with the Court's schedule, the Motion Hearing initially scheduled for May 1, 2026 at 10:00 AM is RESET for May 1, 2026 at 2:00 PM in Courtroom 25A− In Person before Judge Amy Berman Jackson. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/20/2026. (zdrf) (Entered: 03/20/2026) |
| 03/23/2026 | | MINUTE ORDER granting 10 Motion for Leave of Jeffrey I. Shinder to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the |

| | | |
|---|---|---|
| | | lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Amy Berman Jackson on 3/23/2026. (lcem) (Entered: 03/23/2026) |
| 03/23/2026 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Katherine Deabler−Meadows, Filing fee $ 100, receipt number ADCDC−12314389. Fee Status: Fee Paid. by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, SARAH STARKS. (Attachments: # 1 Declaration of K. Deabler−Meadows, # 2 Appendix Certificate of Good Standing, # 3 Text of Proposed Order)(Hollywood, Meegan) (Entered: 03/23/2026) |
| 03/23/2026 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. BROOKE ROLLINS served on 3/23/2026; UNITED STATES DEPARTMENT OF AGRICULTURE served on 3/23/2026, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 03/23/2026., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/23/2026. ( Answer due for ALL FEDERAL DEFENDANTS by 5/22/2026.) (Attachments: # 1 Exhibit)(Hollywood, Meegan) (Entered: 03/23/2026) |
| 03/24/2026 | | MINUTE ORDER granting 12 Motion for Leave of Katherine Deabler−Meadows to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Amy Berman Jackson on 3/24/2026. (lcem) (Entered: 03/24/2026) |
| 03/31/2026 | 14 | NOTICE of Appearance by Ellison Snider on behalf of All Plaintiffs (Snider, Ellison) (Entered: 03/31/2026) |
| 03/31/2026 | 15 | NOTICE of Appearance by Lindsay R. Maher on behalf of All Plaintiffs (Maher, Lindsay) (Entered: 03/31/2026) |
| 04/03/2026 | 16 | NOTICE of Appearance by Katharine Deabler−Meadows on behalf of All Plaintiffs (Deabler−Meadows, Katharine) (Entered: 04/03/2026) |
| 04/03/2026 | 17 | ADMINISTRATIVE RECORD by BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE. (Attachments: # 1 AR Certification, # 2 Requests and Approvals, # 3 State Plans, # 4 Memos and Authorities, # 5 Press Releases, # 6 Studies, # 7 Technical Assistance Part I, # 8 Technical Assistance Part II)(Sirkovich, Eitan) (Entered: 04/03/2026) |
| 04/03/2026 | 18 | Cross MOTION for Summary Judgment by BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Sirkovich, Eitan) (Entered: 04/03/2026) |
| 04/03/2026 | 19 | Memorandum in opposition to re 9 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *and Relief Pursuant to 5 USC 705* filed by BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE. (Sirkovich, Eitan) (Entered: 04/03/2026) |

| | | |
|---|---|---|
| 04/07/2026 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Ciara Wren Malone, Filing fee $ 100, receipt number ADCDC−12345595. Fee Status: Fee Paid. by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, AMANDA JOHNSON, SARAH STARKS. (Attachments: # 1 Declaration of C. Malone, # 2 Appendix Certificate of Good Standing, # 3 Text of Proposed Order)(Hollywood, Meegan) (Entered: 04/07/2026) |
| 04/09/2026 | | MINUTE ORDER granting 20 Motion for Leave of Ciara Wren Malone to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Amy Berman Jackson on 4/9/2026. (lcem) (Entered: 04/09/2026) |
| 04/10/2026 | 21 | NOTICE of Appearance by Jeffrey M. Harris on behalf of THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY. (Harris, Jeffrey) Modified docket text on 4/13/2026, pursuant to Counsel. (mg). (Entered: 04/10/2026) |
| 04/10/2026 | 22 | MOTION for Leave to File Amicus Brief by THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Harris, Jeffrey) (Entered: 04/10/2026) |
| 04/13/2026 | 23 | TRANSCRIPT OF SCHEDULING CONFERENCE before Judge Amy Berman Jackson held on March 20, 2026; Page Numbers: 1−18. Date of Issuance: 4/13/2026. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/4/2026. Redacted Transcript Deadline set for 5/14/2026. Release of Transcript Restriction set for 7/12/2026.(Wayne, Bryan) (Entered: 04/13/2026) |
| 04/15/2026 | 24 | RESPONSE re 18 Cross MOTION for Summary Judgment *and Reply re 19* filed by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, AMANDA JOHNSON, SARAH STARKS. (Attachments: # 1 Declaration, # 2 Declaration of Meegan Hollywood, Esq., # 3 Exhibit Exhibits 1−3, # 4 Certificate of Service)(Hollywood, Meegan) (Entered: 04/15/2026) |
| 04/15/2026 | 25 | REPLY to opposition to motion re 9 Motion for Summary Judgment filed by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, AMANDA JOHNSON, SARAH STARKS. (See Docket Entry 24 to view document). (znmw) (Entered: 04/16/2026) |

| | | |
|---|---|---|
| 04/20/2026 | 26 | NOTICE of Appearance by Ciara Wren Malone on behalf of All Plaintiffs (Malone, Ciara) (Entered: 04/20/2026) |
| 04/20/2026 | | MINUTE ORDER granting 22 the motion for leave to file amicus brief by the Foundation for Government Accountability. The Clerk of Court is ORDERED to file the amicus brief [22−1] on the docket. SO ORDERED. Signed by Judge Amy Berman Jackson on 4/20/2026. (lcabj1) (Entered: 04/20/2026) |
| 04/21/2026 | 27 | NOTICE of Appearance by Jeffrey Shinder on behalf of All Plaintiffs (Shinder, Jeffrey) (Entered: 04/21/2026) |
| 04/22/2026 | 28 | REPLY to opposition to motion re 18 Motion for Summary Judgment filed by BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE. (Attachments: # 1 Declaration of Casey McConnell)(Sirkovich, Eitan) (Entered: 04/22/2026) |
| 04/22/2026 | 30 | AMICUS BRIEF by FOUNDATION FOR GOVERNMENT ACCOUNTABILITY. (znmw) (Entered: 04/23/2026) |
| 04/23/2026 | 29 | ERRATA by BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE re 28 Reply to opposition to Motion. (Attachments: # 1 Errata Updated Reply to Plaintiffs' Opposition to Defendants' Cross−Motion for Summary Judgment)(Sirkovich, Eitan) (Entered: 04/23/2026) |
| 04/29/2026 | 31 | NOTICE of Appearance by Cesar Azrak on behalf of All Defendants (Azrak, Cesar) (Entered: 04/29/2026) |
| 05/01/2026 | | Minute Entry for Motion Hearing proceedings held on 5/1/2026 before Judge Amy Berman Jackson. Arguments heard and taken under advisement. (Court Reporter Janice Dickman) (zdrf) (Entered: 05/01/2026) |
| 05/04/2026 | | MINUTE ORDER. Given the issues discussed at the hearing on May 1, 2026, the parties may file supplemental submissions, not to exceed five pages, to address the overall statutory scheme and the question of whether the presence of a specific provision concerning pilot programs related to health and nutrition in 7 USC § 2026(k), and the terms of that provision, bear in any way on the interpretation of the terms of or Congressional intent behind the pilot programs authorized under section 2026(b) and if so, how. Supplemental submissions are due by May 8, 2026. SO ORDERED. Signed by Judge Amy Berman Jackson on 5/4/2026. (lcabj1) (Entered: 05/04/2026) |
| 05/04/2026 | 32 | AMICUS BRIEF by STATE OF NEBRASKA. (Barnett, Cody) (Entered: 05/04/2026) |
| 05/05/2026 | 33 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on May 1, 2026; Page Numbers: 1−65. Date of Issuance: May 5, 2026. Court Reporter: Janice Dickman, Telephone number: 202−354−3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal |

| | | |
|---|---|---|
| | | identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/26/2026. Redacted Transcript Deadline set for 6/5/2026. Release of Transcript Restriction set for 8/3/2026.(Dickman, Janice) (Entered: 05/05/2026) |
| 05/08/2026 | 34 | SUPPLEMENTAL MEMORANDUM to re 9 *Motion for Summary Judgment* filed by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, AMANDA JOHNSON, SARAH STARKS. (Malone, Ciara) Modified to add link on 5/12/2026 (znmw). (Entered: 05/08/2026) |
| 05/08/2026 | 35 | SUPPLEMENTAL MEMORANDUM to re 18 *Motion for Summary Judgment* filed by BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE. (Azrak, Cesar) Modified to add link on 5/12/2026 (znmw). (Entered: 05/08/2026) |
| 06/22/2026 | 36 | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 6/22/2026. (lcabj1) (Entered: 06/22/2026) |
| 06/22/2026 | 37 | ORDER granting 9 plaintiffs' motion for summary judgment and denying 18 defendants' cross−motion for summary judgment. Judgment is entered in favor of plaintiffs on Counts One and Three, and the Court declined to reach Count Two. See the Memorandum Opinion 36 and Order for details. Signed by Judge Amy Berman Jackson on 6/22/2026. (lcabj1) (Main Document 37 replaced on 6/22/2026) (zdrf). (Entered: 06/22/2026) |
| 07/21/2026 | 38 | NOTICE OF WITHDRAWAL OF APPEARANCE as to BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE. Attorney Cesar Azrak terminated. (Azrak, Cesar) (Entered: 07/21/2026) |
| 07/22/2026 | 39 | MOTION for Attorney Fees *and Expenses* by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, AMANDA JOHNSON, SARAH STARKS. (Attachments: # 1 Text of Proposed Order Proposed Order on Plaintiffs' Motion for Fees and Expenses)(Deabler−Meadows, Katharine) (Entered: 07/22/2026) |
| 07/22/2026 | 40 | MEMORANDUM re 39 MOTION for Attorney Fees *and Expenses* by NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, AMANDA JOHNSON, SARAH STARKS. (Attachments: # 1 Declaration Deabler−Meadows Declaration, # 2 Exhibit Deabler−Meadows Ex A, # 3 Exhibit Deabler−Meadows Ex B, # 4 Exhibit Deabler−Meadows Ex C, # 5 Declaration SCL Declaration, # 6 Exhibit SCL Ex A, # 7 Exhibit SCL Ex B, # 8 Exhibit SCL Ex C, # 9 Exhibit Bill of Costs, # 10 Exhibit Bill of Costs Ex)(Deabler−Meadows, Katharine) (Entered: 07/22/2026) |
| 07/28/2026 | 41 | Joint MOTION to Hold in Abeyance re 39 MOTION for Attorney Fees *and Expenses* by BROOKE ROLLINS, UNITED STATES DEPARTMENT OF AGRICULTURE. (Attachments: # 1 Text of Proposed Order)(Sirkovich, Eitan) (Entered: 07/28/2026) |
| 07/29/2026 | | MINUTE ORDER granting 41 the parties' joint motion to hold in abeyance. The Court will hold plaintiffs' motion for attorneys' fees 39 in abeyance until August 24, 2026. The parties must submit a joint status report on that date. SO ORDERED. Signed by Judge Amy Berman Jackson on 7/29/2026. (lcabj1) (Entered: 07/29/2026) |
| 08/20/2026 | 42 | |

| | | |
|---|---|---|
| | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 37 Order on Motion for Summary Judgment, 36 Memorandum & Opinion by UNITED STATES DEPARTMENT OF AGRICULTURE, BROOKE ROLLINS. Fee Status: No Fee Paid. (Sirkovich, Eitan) (Entered: 08/20/2026) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NIEVES ARAGON, *et al.*,

Plaintiffs,

v.

BROOKE ROLLINS, in her official capacity as Secretary of Agriculture, *et al.*,

Defendants.

Case No. 1:26-cv-00861-ABJ

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's summary judgment decision, as set forth in the Memorandum Opinion and Order dated June 22, 2026, ECF Nos. 36, 37.

Date: August 20, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

NOAH T. KATZEN
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Eitan R. Sirkovich*
EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NIEVES ARAGON, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BROOKE ROLLINS,<br>*in her official capacity as*<br>*Secretary of Agriculture, et al.*,<br><br>Defendants. | ) | Civil Action No. 26-0861 (ABJ) |

**ORDER**

Pursuant to Federal Rule of Civil Procedure 56 and 58 and for the reasons stated in the accompanying memorandum opinion [Dkt. # 36], it is hereby **ORDERED** that plaintiffs' motion for summary judgment [Dkt. # 9] is **GRANTED**. Judgment is entered in favor of plaintiffs on Counts One and Three, and the Court declined to reach Count Two. Defendants' cross-motion for summary judgment [Dkt. # 18] is **DENIED**.

The Secretary and USDA's approval of the Colorado, Iowa, Nebraska, Tennessee, and West Virginia pilot projects, *see* A.R. 15–24, 31–48, 54–61, 69–76, and 92–99, and their December 30 memorandum regarding the notice requirement under 7 C.F.R. § 282.1(b), *see* A.R. 190–92, are hereby **VACATED** and **REMANDED**. This means that the pilot projects in Colorado, Iowa, Nebraska, Tennessee, and West Virginia may not proceed.

This is a final, appealable order.

AMY BERMAN JACKSON
United States District Judge

DATE: June 22, 2026

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NIEVES ARAGON, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BROOKE ROLLINS,<br>*in her official capacity as Secretary of Agriculture, et al.*,<br><br>Defendants. | Civil Action No. 26-0861 (ABJ) |

**<u>MEMORANDUM OPINION</u>**

Plaintiffs Nieves Aragon, Marc Craig, Nathan Fleming, Amanda Johnson, and Hunter Starks are individuals who participate in the Supplemental Nutrition Assistance Program ("SNAP") in Colorado, Iowa, Nebraska, Tennessee, and West Virginia. Compl. [Dkt. # 1] ¶¶ 18–22. SNAP is a federally funded, state-administered program that provides monetary benefits to low-income households to buy authorized food products at participating retailers. 7 U.S.C. §§ 2011–14.

Plaintiffs brought this action against the United States Department of Agriculture ("USDA") and Brooke Rollins, in her official capacity as Secretary of Agriculture ("Secretary"), to challenge their approval of state pilot projects that restrict SNAP participants from buying certain foods and beverages with SNAP benefits. Compl. ¶¶ 1–14, 23. The complaint consists of three counts under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, claiming that defendants exceeded their statutory authority, failed to engage in reasoned decision-making, and disregarded a mandatory procedural requirement when approving the pilot projects. Compl. ¶ 14.

Plaintiffs filed the complaint on March 11, 2026, and on March 19, they filed an emergency motion for a temporary restraining order, preliminary injunction, and a stay pending review under 5 U.S.C. § 705. Pls.' Mot. for a TRO, Prelim. Inj., & Other Relief [Dkt. # 9] ("Pls.' Mot."). After a scheduling hearing in which it heard from the parties, the Court consolidated consideration of the emergency motion with the resolution of the case on the merits. Minute Order (Mar. 20, 2026). It deemed plaintiffs' emergency motion to be a motion for summary judgment, established a briefing schedule, and set a motions hearing for May 1, 2026. *Id.*

On April 3, 2026, defendants filed the administrative record and their combined cross-motion for summary judgment and opposition to plaintiffs' motion. Admin. R. [Dkt. # 17] ("A.R."); Defs.' Cross-Mot. for Summ. J & Opp. to Pls.' Mot. [Dkt. # 18] ("Defs.' Cross-Mot."). The motions have been fully briefed by the parties, and two amicus briefs have been submitted as well. *See* Pls.' Reply in Supp. of Pls.' Mot. & Opp. to Defs.' Cross-Mot. [Dkt. # 24] ("Pls.' Opp."); Defs.' Reply to Pls.' Opp. [Dkt. # 29] ("Defs.' Reply"); Br. of the Found. for Gov't Accountability as Amicus Curiae in Supp. of Defs. [Dkt. # 30] ("Foundation Amicus Br."); Br. of the States of Nebraska, Iowa, Tennessee, and West Virginia as Amicus Curiae in Supp. of Defs. [Dkt. # 32] ("States' Amicus Br.").

The Court held a hearing on the motions on May 1, *see* Minute Entry (May 1, 2026), and called for supplemental briefing to address the effect of 7 U.S.C. § 2026(k) on the statutory scheme at issue. *See* Minute Order (May 4, 2026); Pls.' Suppl. Mem. [Dkt. # 34]; Defs.' Suppl. Mem. [Dkt. # 35].

Upon consideration of the entire record, for the reasons stated below, plaintiffs' motion for summary judgment will be **GRANTED**, and defendants' cross-motion for summary judgment will be **DENIED**.

The Court will grant summary judgment in favor of plaintiffs on Counts One and Three, and given those rulings and the remand to be ordered, it need not address Count Two. The section of the statute the Secretary relies upon as authorization to approve the projects at issue, 7 U.S.C. § 2026(b), does not cover projects aimed towards improving the health of SNAP recipients, and the agency sidestepped the section of the statute that does address those projects, section 2026(k) – which sets out strict requirements they must meet – entirely.

Section 2026(b) authorizes projects related to the administrative and logistical efficiency of the SNAP program itself, but the set of projects here all focus on banning certain products, such as soda or candy, to tackle the health, nutrition, and obesity issues prevalent in the low-income population. Meanwhile, section 2026(k) authorizes the Secretary to approve projects to "us[e] [SNAP] to improve the dietary and health status of households eligible for or participating in [SNAP]" and "to reduce overweight, obesity . . . , and associated co-morbidities." With her solicitation and approval of the pilot projects in this case, the Secretary purports to waive not just a mere administrative or technical obstacle, but the very definition of "food" as it was laid down by Congress. Neither the USDA nor the states can force this square peg into a round hole to avoid the plain language of the statute and the requirements of 2026(k).

Defendants also failed to abide by the notice requirement of their own regulation, 7 C.F.R. § 282.1(b), which requires the USDA to post notice of pilot projects in the Federal Register thirty days before implementation if they are likely to have a significant impact on the public. The agency's terse statement that the pilot projects would not have a significant impact

on the public is entitled to little deference and it is directly contrary to the facts in the administrative record.

The Court's analysis should not be taken as a comment on whether the pilot projects are a good idea or not. That is a question of policy that is not before the Court. The federal defendants and the states may have a genuine desire to improve the health of SNAP households by encouraging healthy choices at the store, and they can take lawful steps to meet those goals. But what they cannot do is violate the law and their own regulations along the way.

## BACKGROUND

### A. Statutory Background

In 1964, Congress passed the Food Stamp Act, Pub. L. No. 88-525, 78 Stat. 703 (1964), to establish a "cooperative Federal-State program of food assistance" with the purpose of providing "improved levels of nutrition among low-income households." Congress later replaced the Food Stamp Act with the Food and Nutrition Act of 2008 ("FNA"), 7 U.S.C. § 2011 *et seq.*, which renamed the Food Stamp Program as the Supplemental Nutrition Assistance Program, or "SNAP." Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1853 (2008). But Congress underscored that the objective of the legislation remained:

> To alleviate such hunger and malnutrition, a supplemental nutrition assistance program is herein authorized which will permit low-income households to obtain a more nutritious diet . . . by increasing food purchasing power for all eligible households who apply for participation.

7 U.S.C. § 2011; *see id.* ("[T]o promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households.").

SNAP operates through the federal and state governments. The federal legislature appropriates funds to the program, and the Secretary and Department of Agriculture are authorized "to formulate and administer" the program "at the request of the State agency." *Id.*

§ 2013(a). The Secretary establishes "uniform national standards for eligibility," "prescribe[s] appropriate procedures for the delivery of benefits," and promulgates regulations that apply nationwide to the program. *Id.* §§ 2014(b), 2016(d); *see generally id.* §§ 2014–2016. And the Department's Food and Nutrition Service ("FNS") is charged with federal oversight of the program, which includes responsibility for the monitoring and compliance of retailers who participate in SNAP. A.R. 185.

States that participate in SNAP designate a single agency to be responsible for day-to-day administration of the program and compliance with federal requirements. 7 U.S.C. § 2020(a). Individual "households" apply to the state agency for SNAP benefits, and if they are approved, the benefits are loaded onto an electronic benefit transfer card ("EBT card") that can be used at participating retailers to purchase products in the same manner as a debit card. *Id.* §§ 2014, 2016(h), 2020(a)(1).

While the Food and Nutrition Act accords some discretion to the states in how they administer SNAP, *see id.* § 2020 (state administration), federal law contains definitions of key terms that apply universally. *See id.* § 2012 (definitions). Those definitions include the term "[f]ood," which is statutorily defined as "any food or food product for home consumption except alcoholic beverages, tobacco, hot foods or hot food products ready for immediate consumption." *Id.* § 2012(k).[1] Under USDA regulation, SNAP benefits can only be used to purchase "food" as defined by the statute. 7 C.F.R. § 274.8.

Section 2026(b) of the Food and Nutrition Act authorizes the Secretary of Agriculture to "conduct on a trial basis, . . . pilot or experimental projects designed to test program changes that

---

1 The definition of food also contains several specific carveouts for certain groups, such as persons over the age of sixty and participants who are disabled, but those are not at issue in this case. *See* 7 U.S.C § 2012(k).

might increase the efficiency of [SNAP] and improve the delivery of [SNAP] benefits to eligible households." 7 U.S.C. § 2026(b)(1)(A). Under this section, the Secretary "may waive any requirement of [the Act] to the extent necessary" for a project to be conducted. *Id*.

Pilot projects under section 2026(b) "may not be conducted unless (i) the project is consistent with the goal of [SNAP] of providing food assistance to raise levels of nutrition among low-income individuals; and (ii) the project includes an evaluation to determine the effects of the project." *Id.* § 2026(b)(1)(B)(i). According to the statute, the "Permissible purposes" of such projects are: (1) to "improve program administration"; (2) to "increase the self-sufficiency of [SNAP] recipients"; (3) to "test innovative welfare reform strategies"; or (4) to "allow greater conformity with the rules of other programs than would be allowed but for this paragraph." *Id.* § 2026(b)(1)(B)(ii).

An entirely separate provision of the statute, section 2026(k), authorizes the Secretary to carry out pilot projects to for the specific purpose of: (1) "using [SNAP] to improve the dietary and health status of households eligible for or participating in the supplemental nutrition assistance program"; and (2) "to reduce overweight, obesity (including childhood obesity), and associated co-morbidities." *Id.* § 2026(k)(1). This provision requires that the Secretary's selection of projects "must be evaluated against publicly disseminated criteria," including:

> (i) identification of a low-income target audience that corresponds to individuals living in households with incomes at or below 185 percent of the poverty level;
>
> (ii) incorporation of a scientifically based strategy that is designed to improve diet quality through more healthful food purchases, preparation, or consumption;
>
> (iii) a commitment to a pilot project that allows for a rigorous outcome evaluation, including data collection;

> (iv) strategies to improve the nutritional value of food served during school hours and during after-school hours;
>
> (v) innovative ways to provide significant improvement to the health and wellness of children;
>
> (vi) other criteria, as determined by the Secretary.

*Id.* § 2026(k)(2)(C) (subsection titled "Selection criteria"). Pilot projects under section 2026(k) "may" include those that "determine whether healthier food purchases by and healthier diets among households participating in [SNAP] result from projects that":

> (A) increase the supplemental nutrition assistance purchasing power of the participating households by providing increased supplemental nutrition assistance program benefit allotments to the participating households;
>
> (B) increase access to farmers' markets by participating households through the electronic redemption of supplemental nutrition assistance program benefits at farmers' markets;
>
> (C) provide incentives to authorized supplemental nutrition assistance program retailers to increase the availability of healthy foods to participating households;
>
> (D) subject authorized supplemental nutrition assistance program retailers to stricter retailer requirements with respect to carrying and stocking healthful foods;
>
> (E) provide incentives at the point of purchase to encourage households participating in the supplemental nutrition assistance program to purchase fruits, vegetables, or other healthful foods; or
>
> (F) provide to participating households integrated communication and education programs, including the provision of funding for a portion of a school-based nutrition coordinator to implement a broad nutrition action plan and parent nutrition education programs in elementary schools, separately or in combination with pilot projects carried out under subparagraphs (A) through (E).

*Id.* § 2026(k)(3)(A)–(F).

The USDA has promulgated regulations governing the approval of pilot projects under either section 2026(b) or section 2026(k). These include a notice provision:

> At least 30 days prior to the initiation of a demonstration project, FNS shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public. The notice shall set forth the specific operational procedures and shall explain the basis and purpose of the demonstration project. If significant comments are received in response to this General Notice, the Department will take such action as may be appropriate prior to implementing the project. If the operational procedures contained in the General Notice described above are significantly changed because of comments, an amended General Notice will be published in the Federal Register at least 30 days prior to the initiation of the demonstration project, except where good cause exists supporting a shorter effective date. The explanation for the determination of good cause will be published with the amended General Notice. The amended General Notice will also explain the basis and purpose of the change.

7 C.F.R. § 282.1(b).

Finally, the Food and Nutrition Act lays out consequences for households and retailers that fail to abide by program rules. If a federal court, state court, or an administrative agency finds that a participant has used their SNAP benefits in violation of the FNA or the USDA's regulations, the participant "shall, immediately upon the rendering of such determination, become ineligible for further participation in the program." 7 U.S.C. § 2015(b)(1). Individuals who knowingly use SNAP benefits "in any manner contrary to the [FNA] or the regulations issued pursuant to [the FNA]" can also be subject to criminal penalties. *See id.* § 2024(b)(1) (listing felony and misdemeanor penalties). Retailers can also be disqualified from the program if they accept SNAP benefits for impermissible purposes. *Id.* § 2021(a)(1)(A); 7 C.F.R. § 278.1(l).

**B. Factual Background**

This case concerns pilot projects that the Secretary and the USDA solicited and approved in Colorado, Iowa, Nebraska, Tennessee, and West Virginia. For each project, the state sought a

"waiver" to exempt certain foods and beverages from the Food and Nutrition Act's definition of "food," and in turn, each project bars SNAP participants from purchasing those foods and beverages with SNAP benefits. The federal defendants approved all of the projects in reliance upon their authority under 7 U.S.C. § 2026(b), and every project encompasses all of the SNAP participants in the given state, with no opt-outs for any participant on any basis. The projects have already begun in Colorado, Iowa, Nebraska, and West Virginia, and the Tennessee project is scheduled to go into effect on July 31, 2026.

The administrative record contains a similar set of documents related to the approval of each pilot project, including: (1) the state's request proposing the pilot project; (2) the USDA's letter of approval summarizing the project and setting conditions the state must satisfy before implementation; and (3) further planning documentation issued by both the states and the federal government, covering certain aspects of implementation.[2] Because the requests, approvals, and the planning documentation follow the same pattern, and the substance is generally similar, the Court will lay out the timeline and the details of all the projects together, rather individually.

**1. The federal government's call to action**

On February 13, 2025, Brooke Rollins was sworn into office as the Secretary of Agriculture, and on the same day, she sent a letter to all state, tribal, territory, and local government partners of the USDA. A.R. 193–94; *Brooke L. Rollins Sworn in as 33rd U.S. Secretary of Agriculture*, U.S. Dep't of Agric. (Feb. 13, 2025), https://perma.cc/W9HW-GMGP. The letter stated:

2 The record also includes a category of documents that defendants labelled as "Technical Assistance to the States." *See* A.R. 498–787. It contains communications and drafts shared between the states and the USDA to prepare the pilot project requests and then implement the projects.

> I am inviting every State, territory, and tribal leader in the nation to participate in our "Laboratories of Innovation" initiative to serve as policy incubators and bring greater efficiency to government programs. We encourage you propose bold ideas to address challenges that have long plagued our nation, particularly rural communities. . . . This includes bold plans to combat avian flu and make food prices more affordable; new initiatives to bring more jobs and economic opportunities to rural communities and ensure that we equip and empower the next generation of American farmers; create partnerships to improve infrastructure and internet connectivity in remote areas; and much-needed reforms to nutrition assistance programs to promote the dignity of work and healthy eating habits to ensure our citizens live longer, more abundant lives.

A.R. 193–94.

The USDA then sent the states a template for a "SNAP Healthy Choice/Food Restriction State Demonstration Request." *See, e.g.*, A.R. 3, 78. The introduction explained that "this template intends to guide and assist States in submitting a SNAP Food Restriction Demonstration Project Request." A.R. 3. It stated that the federal agency had authority under section 2026(b) of the Food and Nutrition Act "to waive statutory requirements of the Act to conduct pilot projects," subject to certain restrictions. A.R. 3. And it asserted that "SNAP Food Restriction demonstration projects are intended to test innovative ideas that," among other things, "strengthen State strategies to encourage healthy choices, healthy outcomes, and healthy families." A.R. 3. It directed the states to "follow the guided prompts and questions and offer any additional detail . . . under each section to ensure a complete understanding of the State's proposed project." A.R. 3.

**2. The states' pilot project requests**

Between April 1, 2025 and August 12, 2025, Iowa, Nebraska, West Virginia, Colorado, and Tennessee submitted requests to the USDA to conduct pilot projects, and each request followed the same structure.

First, each state sought to waive the federal definition of "food," and replace it with a definition that excluded specific items. A.R. 4–5, 26, 50, 63, 79. Colorado asked to modify the definition to exclude "soft drinks," defined as "nonalcoholic beverages that contain natural or artificial sweeteners," but not "beverages that contain milk or milk products, soy, rice, or similar milk substitutes, or greater than fifty percent of vegetable or fruit juice by volume." A.R. 5. Nebraska similarly sought to exclude "Soda or 'Soft Drinks'" and "Energy drink." A.R. 50. It defined "Soda or 'Soft Drinks'" as "any carbonated non-alcoholic beverage that contains water, a sweetening agent (including but not limited to sugar, high-fructose corn syrup, or artificial sweeteners), flavoring, and carbon dioxide gas to create carbonation." A.R. 50. And it defined "Energy drink" as:

> [C]arbonated or non-carbonated beverages containing a stimulant such as fortified caffeine, guarana, glucuronolactone, or taurine. They may also include herbal extracts such as ginseng, mineral salts and vitamins, or high doses of organic acids, amino acids, inositol, sugars, or other similar compounds in addition to sweeteners. Juices or natural fruit pulp or concentrates may also be added. Energy drinks are specifically formulated to enhance energy, alertness, or physical performance.

A.R. 50.

West Virginia requested permission to modify the federal definition to exclude "the purchase of soda," defined as:

> [A]ny carbonated non-alcoholic beverage that contains water, a sweetening agent (including but not limited to sugar, high-fructose corn syrup, or artificial sweeteners), flavoring, and carbon dioxide gas to create carbonation. This term includes beverages with added caffeine or other ingredients but does not include carbonated water without sweeteners or flavoring. The following drink options are not included in this waiver and will remain available for purchase with SNAP: milk and milk products, fruit and vegetable juice, or water and water products.

A.R. 79–80.

Tennessee's request sought to exclude any:

(a) Processed foods that list sugar, cane sugar, corn syrup, or high fructose corn syrup as the first ingredient, excluding granulated sugar, raw sugar, and other single-ingredient sugars used for cooking and baking.

(b) Beverages that list carbonated water and sugar, cane sugar, corn syrup, and high fructose corn syrup as the first two ingredients. Beverages that list aspartame or other low- or non- caloric sweeteners as the first two ingredients remain eligible for purchase.

A.R. 63.

Iowa sought to replace the federal definition with "all nontaxable food items as defined by the Iowa Department of Revenue," which would exclude an array of items that it noted in a chart:

| Food Items | Beverages |
|---|---|
| Seeds for food producing plants and food producing plants. | Carbonated and noncarbonated soft drinks, including but not limited to colas, ginger ale, near-beer, root beer, lemonade, orangeade |
| Candy, candy-coated items, and candy products, including gum, candy primarily intended for decorating baked goods, and hard or soft candies including jelly beans, taffy, licorice, and mints and breath mints | All other drinks or punches with natural fruit or vegetable juice which contain 50 percent or less by volume natural fruit or vegetable juice; a typical example is Hi-C |
| Dried fruit leathers or other similar products prepared with natural or artificial sweeteners | Beverage mixes and ingredients intended to be made into taxable beverages; liquid or frozen, concentrated or non-concentrated, dehydrated, powdered, granulated, sweetened or unsweetened, seasoned or unseasoned |
| Sweetened baking chocolate in bars, pieces, or chips | Concentrates intended to be made into beverages which contain 50% or less by volume natural fruit or vegetable juice |
| Fruits, nuts, or other ingredients in combination with sugar, chocolate, honey, or other natural or artificial sweeteners in the form of bars, drops, or pieces | Sweetened naturally or artificially sweetened water |
| Caramel wraps, caramel or other candy-coated apples or other fruit; sweetened coconut, | |

marshmallows; Granola bars, unless they contain flour

Mixes of candy pieces, dried fruits, nuts, and similar items when candy is more than an incidental ingredient in the product

Ready-to-eat caramel corn, kettle corn, and other candy-coated popcorn

A.R. 26–27.

Each request announced that the project would cover the entire SNAP population of the state, including every recipient and every participating retailer. A.R. 5, 28, 52, 63–64, 81. As West Virginia put it:

> As of March 2025, West Virginia had a statewide SNAP caseload of 146,488 households and 273,981 individual recipients. 100% of WV's SNAP caseload will be affected by this waiver. The waiver will span the entire population as well as including both metropolitan and rural areas for all ages. . . . This waiver will impact all SNAP retailers (2,118) in West Virginia. All retailers must comply within 12 months of the waiver implementation date, or they will not be eligible to be SNAP retailers.

A.R. 81–82; *see also* A.R. 28 (explaining that Iowa's project would "apply to the entire Iowa SNAP population"). None of the project requests provided any means to opt out of the restrictions, for medical or any other reasons.

Each request also included the state's justification for the project. Nebraska stated that its project would "improve the health of low-income SNAP recipients and increase responsible spending of federal SNAP dollars." A.R. 52. The state made it clear that the program was specifically directed towards reducing obesity and related medical conditions:

> [D]ata shows Nebraska, like many others, is experiencing a health epidemic further induced by diet-related chronic disease. Numerous studies equate consumption of unhealthy food and drink, including soft drinks, sweetened beverages, candy, and other junk food, to instances of disease, including obesity, diabetes, high blood pressure, heart disease, and even some cancers. Notably, the diet quality of SNAP families has

> worsened over the past decade regardless of incentive programs and nutrition education. . . . Multiple studies have shown that SNAP participation is associated with increased obesity risk. While SNAP was initially aimed at alleviating food shortfalls, many low-income individuals today are overeating the wrong foods. Studies have shown that low-income adults and children have higher obesity rates than other Americans. A recent review by Jerold Mande and Grace Flaherty found that children participating in SNAP were more likely to have elevated disease risk and consume more sugar-sweetened beverages, more high-fat dairy, and more processed meats than nonparticipants. . . . Implementing this waiver may assist Nebraskans in consuming healthier options and reduce chronic disease and the costs surrounding their medical care, which is a necessary component in the move to make Nebraska healthy again.

A.R. 51–52.

West Virginia similarly posited that soda was "detrimental to the health of its SNAP population and is antithetical to the purpose of the SNAP program," and emphasized its desire to "improve the health of low-income SNAP recipients and increase responsible spending of federal SNAP dollars." A.R. 79.

> West Virginia, like other states, is experiencing a health epidemic of obesity and other chronic diseases such as type 2 diabetes and heart disease resulting from consumption of foods with high sugar content. One of the most commonly purchased items in this category includes sugar sweetened beverages (soda). Numerous studies have shown the detrimental impact of consumption of items with high sugar content, and it has been shown that more than half of sugar consumption is from sugar sweetened beverages (soda).
>
> * * *
>
> West Virginia recently became the first state in the United States to create a state law to ban harmful food additive dyes, including blue #1, blue #2, red #3, red #40 and yellow #5 . . . . The request to exclude soda will assist West Virginia in aligning our SNAP program goals with the overall health goals of our state.
>
> According to the Centers for Disease Control and Prevention (CDC), as of 2023, WV was one of only three states to have an obesity prevalence of 40% or greater (41.2%). Also, according to recent reports, approximately 73.9% of all West Virginians are either overweight or obese. These statistics highlight significant public health challenges in the Mountain State, with obesity being linked to various health issues.
>
> * * *

> In federal fiscal year 2024, West Virginia Medicaid (excluding CHIP) paid $157,271,330.13 in pharmacy claims for medications related to diabetes and weight management. This substantial expenditure underscores the financial burden that obesity-related chronic illnesses impose on public healthcare programs. Allowing SNAP benefits to be used for the purchase of nutritionally void, sugar-sweetened beverages may be contributing to these preventable health conditions and their associated costs. Implementing policies that promote healthier food choices within SNAP – such as restricting the purchase of soda pop – has the potential to reduce the prevalence of diet-related disease and, in tum, generate long-term savings for Medicaid and other taxpayer-funded healthcare programs.

A.R. 80–81.

Tennessee's stated goal was "to promote healthier eating habits among participants, supporting improved health outcomes and reducing diet-related conditions by encouraging the use of SNAP benefits for more nutritious food options." A.R. 63. Colorado's project was designed to serve SNAP's goal of "providing food assistance to raise levels of nutrition among low-income individuals," A.R. 5, and it would "ensure[] that SNAP dollars are not being spent on sweetened beverages with no or negative nutritional value." A.R. 9. And "Iowa wishe[d] to refocus the SNAP program on its designed intent, 'to promote the general welfare and safeguard the health and wellbeing' by encourage SNAP participants to purchase healthier food items." A.R. 28.

Then, to different extents, the requests laid out plans to implement the pilot projects. West Virginia explained that it would "begin a comprehensive communications rollout two months prior to the implementation date," which would "be targeted specifically to SNAP households, while informing the general public and stakeholder groups in food advocacy." A.R. 85. The state would also "work to educate existing retailers about which items may be purchased with SNAP," and it would require retailers "to implement point-of-sale (POS) system changes that support real-time transaction adjudication," meaning that "[t]ransactions involving

restricted items will be automatically declined at the point of sale." A.R. 82–83. The plans called for the West Virginia Office of Inspector General to work with USDA to construct "an appropriate and operable plan to ensure WV SNAP retailers do not allow the purchase of soda using SNAP benefits." A.R. 84.

Nebraska offered that its "outreach efforts [would] be completed through multiple avenues including text messages, collaboration with community partners, current nutrition education efforts, and mailings, recipes and nutrition information made available on websites and in-person classes and programs focused on healthy nutritious food choices." A.R. 52. The state would also work with the USDA to "ensure retailer compliance is maintained." A.R. 52.

Colorado would finalize a plan to communicate the project to all stakeholders, and "work with retailers of all sizes to develop strategies based on . . . size and technology." A.R. 5–6. Its compliance would be accomplished through an "annual Attestation by all Colorado retailers of their compliance with the 'soft drink' restrictions." A.R. 7.

Tennessee planned to communicate the requirements of the project through:

> - Customer communication materials with clear messaging to support understanding of the changes;
> - Training materials for [state agency] and partner staff who interact with SNAP customers, to ensure staff are prepared to explain the changes and answer questions accurately and confidently;
> - Retailer-facing resources available through a dedicated webpage and electronic updates, such as signage templates, informational posters, and FAQs to support communication at the point of sale;
> - Dedicated webpage to support customers throughout the demonstration.

A.R. 65. The state would create "an FAQ, standardized messaging, signage templates, talking points for retailer staff, and other information that supports clear, uniform communication."

A.R. 64. As for compliance, Tennessee planned to "ask retailers to complete an attestation form affirming compliance" with the project. A.R. 65.

Finally, each request laid out the state's plan to evaluate the outcome of the pilot projects. Iowa explained that it would use a "mixed-methods approach . . . to understand the programmatic impacts, participant shopping patterns, change in health behaviors, and changes in youth health outcomes." A.R. 28. The "question [it] would seek to answer" would be: "[a]re there differences in participants healthy eating behaviors who receive nutrition education in addition to SNAP benefits vs those who receive no education?" A.R. 29. And it would answer that question by:

> Conduct[ing] an impact study using a stratified sampling method to survey and analyze participant shopping and eating patterns at pre, mid, and post checkpoints. The sample size would include participants in both urban and rural areas of Iowa. Pre would mean surveying before this demonstration goes into effect, mid would mean surveying halfway through this demonstration period, and post would be surveying at the conclusion of the demonstration period. The purpose of this study would be to assess how participants health is impacted by this demonstration and if additional nutritional supports and education for participants leads to higher health behavior change efficacy.

A.R. 28–29.

Nebraska's "[p]reliminary plans" included "a pulse study for all SNAP participants on a quarterly basis to evaluate their spending habits prior to the waiver implementation and in each quarter following implementation." A.R. 53. In addition, the state planned to "review SNAP purchases and determine the reduction in purchases of soda and energy drinks," and to "continue to review reports and data regarding obesity rates for both adults and children in Nebraska." A.R. 53.

West Virgina would:

> [I]ncorporate an analysis of Medicaid claims data to assess changes in obesity-related health outcomes over the course of the demonstration period. Specifically, the state will monitor trends in the diagnosis and treatment of conditions closely associated with high consumption of sugar-sweetened beverages, including Type 2 diabetes, hypertension, obesity, and related cardiovascular diseases. By analyzing claims data before and after implementation of the waiver, the state aims to identify any correlation between reduced soda consumption - encouraged through the restriction - and positive shifts in Medicaid utilization patterns.
>
> The evaluation will involve longitudinal analysis of claims data across affected SNAP households, using comparison groups to account for confounding variables. West Virginia will also explore stratified data by region, age group, and demographic characteristics to better understand the waiver's effects on subpopulations. As part of the evaluation plan, the state may engage an external research partner to ensure methodological rigor and to provide USDA with an independent analysis of the health-related impacts. These findings will be used not only to assess the effectiveness of the waiver in promoting public health, but also to inform the potential for permanent policy adoption.
>
> * * *
>
> The State agency through its partnership with WVU Extension Family Nutrition Program (the implementing agency for WV SNAP-Ed) will gather state specific data on soda consumption trends before and after the restriction waiver, to determine improved health outcomes as a result of decreased soda consumption. WV will utilize data from the CARDIAC program to measure future health metrics for students.
>
> WV SNAP-Ed will collect data about recipient beverage behavior and consumption and related health outcomes, through adult direct education outreach. This will include collecting surveys and interviews related to beverage purchases consumption based on a 24-hour dietary recall.

A.R. 86. The state also announced plans to "assess potential impacts (economic, nutritional, emotional), as well as understanding concerns such as stigma and food access for SNAP households," and it would "measure client satisfaction through existing tracking mechanisms." A.R. 87.

Colorado's request explained that it would conduct:

> an outcome study (examination of the extent to which an intervention program achieves its stated goals; does not establish cause and effect conclusions) using a convenience sampling approach to analyze

> participant food purchasing and consumption behaviors at two time points: pre-implementation and post implementation of the SNAP demonstration project. Regular planning meetings will be held with The Colorado Department of Human Services and The University of Colorado, Denver's Rocky Mountain Prevention Research Center.
>
> The target population will be SNAP-enrolled Coloradans. Participants will receive survey questions about their shopping and consumption behaviors. Implementing agencies in Colorado that work with SNAP-eligible populations will enroll participants through established recruitment channels and/or use existing data to establish baseline measures. The state will also survey SNAP-enrolled individuals about their purchasing and consumption behaviors before and after the waiver implementation.
>
> A survey instrument will be developed to address the research questions. The instrument will be created using the SNAP-Ed Evaluation Framework and Interpretive Guide: specifically, indicators ST1 and MT1, which measure goals and behaviors around dietary intake; as well as ST2 and MT2, which measure goals and behaviors around grocery shopping. The measures reflect the Transtheoretical model (Stages of Change).

A.R. 10–11.

Finally, Tennessee's request stated that it would "develop retailer and customer experience surveys to collect data on food purchasing habits, non-SNAP spending, and qualitative data." A.R. 67. The evaluation would "include an assessment of the . . . impact on program access as it pertains to customers," with "[d]ata elements" pertaining to "the number and locations of approved retailers over time" and a "customer experience survey" that would "include questions that measure customer satisfaction." A.R. 67. It would also assess the "impact on program access as it pertains to retailers" with the same data elements, along with a "retailer experience survey" that would include questions measuring "retailer satisfaction." A.R. 67.

### 3. The Secretary and USDA's approval

For each state's pilot project request, the Secretary and the USDA responded with an approval letter that summarized the parameters of the project and set conditions the state had to satisfy before implementation. A.R. 15–22, 31–39, 54–61, 69–76, 92–99.

Each letter specified that the project was approved "in accordance with the requirements" of 7 U.S.C. § 2026(b) and authorized the state to waive the statutory definition of "food" to replace it with the state's proposed definition, sometimes with minor changes. A.R. 16–17, 32–34, 55–56, 69–71, 93–94. As one example, West Virginia's approval letter stated:

> FNS is waiving this section to allow the State to modify the list of items that can be excepted from the definition of "food" items. Items that are not defined as "food" cannot be purchased with SNAP benefits at SNAP-authorized retailers in West Virginia. Specifically, the State amends the definition's language of "any food or food product for home consumption except . . . " to include as an exception, and therefore be ineligible for purchase with SNAP, soda, which the State is defining as any carbonated non-alcoholic beverage that contains water, a sweetening agent, flavoring, and carbon dioxide gas to create carbonation.

A.R. 93.

Each approval letter then confirmed the project's "Eligibility" and "Opt-Out" terms. As to eligibility, the letters stated: "This project will apply to the entire [state] SNAP population (100 percent of the SNAP caseload)." A.R. 16, 32, 56, 70, 93. As to opt-out, each letter contained similar statements that:

> No SNAP household in [the state] may opt out of the SNAP eligible food restrictions project. The purpose of the Project is to evaluate the impact of excluding soda from eligible purchases under SNAP on participant's consumption of these products and enhance the nutrition, and therefore the health, of low-income families. As part of the evaluation of the Project the State is developing key metrics and data collection methods including, but not limited to, surveys, interviews, and dietary recalls. SNAP households' participation in these evaluation and data collection methods is voluntary, and any household may opt into or out of the corresponding evaluation tools.

A.R. 93–94 (West Virginia's letter); *see also* A.R. 16, 32–33, 56, 70–71.

Each approval letter also laid out a list of requirements to be completed before implementation of the project, which included:

- The State will provide a finalized communications plan detailing tasks and timelines for engaging with and notifying SNAP-authorized retailers of the Project.

- The State will provide a finalized communications plan detailing tasks and timelines for notifying and educating SNAP households of the Project.

- The State will provide a finalized evaluation plan defining Project health outcomes and behaviors tracked throughout the Project.

- The State will provide a finalized proposed budget for the Project.

- The State will provide a finalized compliance and monitoring plan for SNAP-authorized retailers.

- SNAP participants' surveys, at a minimum, will collect the following information:

    - Meals and foods eaten outside the home or with foods not purchased at SNAP authorized retailers.

    - Purchase and/or consumption of less healthy or "unhealthy" food items not restricted by the Project.

    - Non-SNAP dollars spent to purchase food items restricted by the Project.

    - SNAP client's ability and confidence in correctly identifying food items that can or cannot be purchased with SNAP benefits during the Project.

    - The point in time in which the SNAP client became aware of the Project and how (State SNAP webpage, retail store signage, State press release, etc.).

    - Any impacts the Project potentially had on participants shopping routines (such as distance traveled to store,

> increase spending of non-SNAP dollars, more frequent shopping trips, etc.).

A.R. 18–20, 35–38, 57–60, 72–74, 94–97.

Moreover, the letters formalized each state's evaluation method. A.R. 21–22, 38–39, 61, 74–75, 98. West Virginia's letter stated:

> To evaluate the Project the State will undertake a mixed-methods approach, and activities will include tracking and analyzing SNAP households and their purchasing habits. If possible, the State will use retailer transaction data, loyalty card purchase records, and macro spending EBT utilization data to track longitudinal shifts in purchasing patterns for specific food and beverage categories over time. The State will also look at Medicaid claims and CARDIAC program data to monitor youth obesity and related conditions over time.

A.R. 98.

The letters approved each project to run for two years, with the projects in Iowa, Nebraska, and West Virginia beginning on January 1, 2026, Colorado on April 30, 2026,[3] and Tennessee on July 31, 2026. A.R. 18, 35, 57, 71, 94.

**i. Post-approval state planning and further guidance from the USDA**

After each state received an approval letter, it submitted further documentation of the preparatory activities the USDA required. For instance, the Colorado's Office of Economic Security, Division of Food & Energy Assistance drafted five documents: a "Participant Communication Plan," a "Retailer Communication Plan," a "Retailer Monitoring and Compliance Plan," a "Waiver Evaluation," and a draft "Waiver Survey." A.R. 102–14.

The Participant Communication Plan stated that "Colorado does not have an appropriation for SNAP communications" and "[i]t is unlikely that the [state agency] will have funds become available," so it "will leverage existing contracts, programs, and partnerships to

3 Colorado was granted a modification to postpone its project's start date to April 30, 2026 because it needed "additional time for the State agency to engage in preparatory activities." A.R. 23.

communicate the change." A.R. 102. The state planned to "develop cogent posters, pamphlets, and other print communications" in English and Spanish to post at "SNAP retailers, community centers, food banks, and other non-profit partners," and it would "develop a one-stop-shop webpage . . . with detailed information about the products allowed and disallowed by the waiver." A.R. 102.

Colorado's Retailer Communication Plan separated retailers into three groups: major retailers and industry associations, small retailers, and new SNAP retailers. A.R. 104. For major retailers, the plan explained that "[t]he State is in the process of creating active lines of communication with the major retailers and State-based industry associations," and it listed points of contact from five retailers. A.R. 104. For small retailers, the state planned to "email retailers to communicate the waiver and address implementation questions," establishing contacts by "leverage[ing] USDA's list of existing SNAP retailers to verify email addresses, [and] calling individual stores where needed to complete the list." A.R. 104–05. For new SNAP retailers, the state proposed to call the new retailer "within two weeks of publication by the USDA." A.R. 105.

The plan also divided retailer communication into an "initial phase" and an "implementation phase." A.R. 105. During the initial phase, the state would "develop and provide periodic email updates to interested retailers," establish a "dedicated and regular 'Office Hours' for retailers . . . to ask questions and communicate their concerns," create a dedicated email contact, and provide a website support page. A.R. 105. During the implementation phase, the state would "provide documentation to retailers that explains eligible and non-eligible products, implementation guidance, the State's Monitoring and Compliance Plan, and the SNAP Participant Communication Plan." A.R. 105.

The "Retailer Monitoring/Compliance" plan explained that compliance would "be assessed based on retailers' good faith efforts to implement and uphold the defined restrictions within their point-of-sale systems." A.R. 107. The state would "consider a retailer compliant so long as they demonstrate a sincere and verifiable effort to follow the waiver's requirements, even if isolated errors occur during implementation." A.R. 107. "Non-compliance meriting formal penalties or federal referral" would be "limited to cases of known violations—where a retailer has been clearly informed of improper transactions and has failed to take corrective action or has willfully disregarded the waiver requirements." A.R. 107.

The plan required all SNAP retailers "to submit an Attestation Form confirming their compliance with the new SNAP . . . restrictions by a specified deadline identified during the implementation . . . , and on an annual basis thereafter." A.R. 107. "Retailers who fail to submit the required Attestation by the specified deadline will be subject to follow-up outreach from the State to address any barriers to compliance and offer additional support." A.R. 107–08. Such retailers would "be allowed 90 days to come into compliance and submit the Attestation," but if they continued non-compliance, the state would coordinate with the USDA "to determine the appropriate course of action." A.R. 108.

Colorado's Waiver Evaluation addressed how the state would evaluate its program. A.R. 109–10. The document posed two research questions to be answered by the evaluation: (1) "How do participants' shopping, spending, and eating patterns change before and after the SNAP program modifications are implemented?" and (2) "How does the exclusion of sugary beverages impact shopping and consumption behaviors of SNAP-enrolled households?" A.R. 109. The document included the same evaluation plan contained in Colorado's original request, repeating that it would conduct an "outcome study" with two state institutions, "using a

convenience sampling approach to analyze participant food purchasing and consumption behaviors at two time points: pre-implementation and post-implementation of the SNAP demonstration project." A.R. 109–10; *compare* A.R. 109–10 *with* A.R. 10–11.

Finally, Colorado supplied a draft to collect feedback on the pilot project from SNAP participants. A.R. 111–14. The survey poses several questions, including: "How did you learn about [the SNAP] restrictions?"; "How often do you purchase soft drinks?"; "Has your purchase of soft drinks changed since the waiver?"; "How often do you purchase soft drinks using your own money?"; "Since the waiver, have you purchased other types of foods or beverages instead of soft drinks using your SNAP benefits?"; and "Since the waiver, how has your soft drink consumption changed?" A.R. 111–14.

While the states were engaging in planning, the USDA also released information regarding the implementation of the food restriction projects. On December 30, 2025, two days before the first projects were set to begin, the agency issued an "Informational Memo" regarding the agency's position on "Food Restriction Waivers and General Notice Rule." A.R. 190–92 ("December 30 memorandum").

> To date, [the agency] has approved 18 State agencies to implement SNAP demonstration waiver projects that temporarily waive the definition of SNAP eligible foods, referred to as SNAP Food Restriction Waivers. [The agency] has approved these 18 State agencies to restrict the food items that SNAP households can purchase using SNAP benefits. Each State agency's waiver is unique, but generally restricts non-nutritious, accessory food items such as sweetened beverages, candies, and prepared desserts.
>
> If FNS determines that a SNAP demonstration project waiver "will likely have a significant impact on the public," federal rules of 7 CFR 282.1(b) require [the agency] to publish a General Notice in the Federal Register at least 30 days prior to implementation.
>
> SNAP has determined that the General Notice Rule of 7 CFR 282.1(b) is not applicable to the Food Restriction Waivers. Food Restriction Waivers

> will limit the accessory food items that SNAP households residing in implementing States can purchase with SNAP, but they will not change SNAP eligibility criteria, allotment levels or access to staple foods. Moreover, SNAP benefits are supplemental, calculated to cover only 70 percent of the household's monthly food budget. SNAP households will remain free to use cash to purchase SNAP restricted items.

A.R. 190.

As "[b]ackground" information, the memorandum also stated that:

- Prior to waiver implementation, State agencies have been engaging intensively with SNAP retailers to coordinate implementation and incorporate retailer feedback;
- State agencies are also providing notification and informational materials about the changes to SNAP households and other stakeholders and have developed websites to inform the public about the changes. All States have issued press releases regarding the waivers and media coverage has been extensive both locally and nationally;
- [The agency] has also created a webpage which posts all approved Food Restriction Waivers publicly, summarizes restricted foods, and provides implementation dates; and
- Prior to waiver implementation, [the agency] plans to issue State-specific notices to retailers that serve SNAP participants of States implementing [pilot projects].

A.R. 190.

On the same day, the USDA sent a memorandum to all of the approved state agencies to clarify its "policies and plans for SNAP-retailer compliance with these SNAP waivers, including guidance on which SNAP retailers must comply, online orders and deliveries, and the consequences for non-compliance." A.R. 182.

The memorandum stated that "[a]ll walk-in SNAP retailer stores physically located within a State implementing a SNAP Food Restriction Waiver must comply with the State's waiver for all SNAP transactions." A.R. 184. It went on to explain that:

> Certain other retailers are also required to comply when fulfilling online orders from a warehouse (fulfillment center), regardless of their location. When a SNAP participant from an implementing State places an online order using SNAP benefits and the retailer fulfills any part of the order from a warehouse, the retailer must comply with the restrictions of that participant's State . . . . This applies to all transactions in which the order is fulfilled from a warehouse not open to customers, whether shipped directly to the customer's address or to a designated pick-up location. Some retailers will therefore be required to comply with multiple States' waivers. Retailers fulfilling orders from warehouses can use the State-issued SNAP EBT card's Bank Identification Number (BIN) to determine SNAP participants' States.

A.R. 184. As an example, the memorandum described a scenario in which "Iowa, Nebraska, and Colorado each have an approved SNAP Food Restriction Waiver." A.R. 184. The warehouse fulfilling the online order "must comply with: Iowa's waiver for purchases made with an Iowa EBT card; Nebraska's waiver for purchases made with a Nebraska EBT card; and Colorado's waiver for purchases made with a Colorado EBT card." A.R. 184.

The memorandum also explained USDA's notification plan for retailers. It stated that "[i]n advance of each State agency's Food Restriction Waiver implementation date, [USDA] will issue electronic notifications to SNAP authorized retailers required to comply with the waiver," and "[t]he notifications will also explain that retailers found to be non-compliant will be subject to Involuntary Withdrawal for failure to effectuate the purpose of SNAP." A.R. 185. USDA would "also add a hard copy letter to its retailer training and informational materials and make them publicly available on its retailer training page" and it would "plan[] to update the retailer application to make clear that compliance with these waivers is a mandatory condition of SNAP authorization." A.R. 185.

The memorandum went on to describe the USDA's plan to monitor retailers. A.R. 185. The agency's Office of Retailer Operations and Compliance would administer federal oversight of the SNAP retailers, and "[t]hrough existing fraud detection practices," it would conduct

"undercover investigations to determine if a retailer is complying with program requirements." A.R. 185. According to the memorandum, "[f]ollowing the implementation of a SNAP Food Restriction Waiver, ROC investigators will incorporate attempts to purchase restricted items according to the State's SNAP Food Restriction policy, beginning 90 days after the implementation date." A.R. 185–86. And the memorandum reminded that, "[t]hough not required by [USDA], State agencies may also employ resources to monitor SNAP retailer compliance after implementation in close coordination with [USDA]." A.R. 186.

Finally, the memorandum laid out the consequences for retailers found to be non-compliant with the food restriction projects, which included a "90-Day Grace Period," followed by a "First Offense – Warning Letter," a "Second Offense – Involuntary Withdrawal," and then "Administrative Review." A.R. 186–87.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the Administrative Procedure Act ("APA"), Rule 56 does not apply due to the limited role of a court in reviewing the administrative record. *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011). Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton*

*Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision is presumed to be valid, *see Citizens to Preserve Overton Park*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations and internal quotation marks omitted).

## ANALYSIS

Plaintiffs bring three claims against the Secretary and the USDA. Count One alleges that defendants' approval of the food restriction pilot projects exceeded their statutory authority under 7 U.S.C. § 2026(b). Compl. ¶¶ 188–92. Count Two alleges that the approval was arbitrary and capricious. Compl. ¶¶ 193–99. And Count Three alleges that the approval was procedurally defective because defendants did not comply with its notice and comment obligations under 7 C.F.R. § 282.1(b). Compl. ¶¶ 200–06.

**I. Plaintiffs have standing.**

Before it addresses the merits, the Court must consider defendants' contention that plaintiffs lack standing to bring suit because they have not suffered an injury-in-fact. Defs.' Cross-Mot. at 7.

Federal courts are courts of limited jurisdiction, and they possess "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The court is "forbidden . . . from acting beyond [its] authority, and no action of the parties can confer subject-matter jurisdiction upon a federal court." *NetworkIP, LLC v. Fed. Commc'ns Comm'n*, 548 F.3d 116, 120 (D.C. Cir. 2008) (internal quotation marks omitted).

Article III of the Constitution provides that federal courts may hear only "Cases" or "Controversies" within its jurisdiction. U.S. Const. art. III, § 2, cl. 1. "[T]o give meaning to" this requirement, "courts have developed a series of principles termed 'justiciability doctrines,'" which include standing, ripeness, mootness, and the political question doctrine. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), citing *Allen v. Wright*, 468 U.S. 737, 750 (1984).

The doctrine of standing considers whether the party seeking to invoke jurisdiction has demonstrated "a personal stake in the outcome" of the case. *Gill v. Whitford*, 585 U.S. 48, 54 (2018), quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962). To establish standing, the plaintiff must show that: (1) he has suffered some actual or threatened injury as a result of the illegal conduct of the defendant; (2) the injury fairly can be traced to the challenged actions; and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

As to the first element, injury-in-fact, the plaintiff must demonstrate that he has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), quoting *Lujan*, 504 U.S. at 560. To be "concrete," the injury "must actually exist," meaning that it is real, and not abstract, although concreteness is "not . . . necessarily synonymous with 'tangible.'" *Id.* at 340–41. And to be "particularized," the injury must affect a plaintiff "in a personal and individual way." *Id.* at 340, quoting *Lujan*, 504 U.S. at 560 n.1. A "plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74.

Plaintiffs have each submitted declarations describing their specific circumstances and the impact the pilot projects have had or will have on them:

- Plaintiff Aragon is a single mother and recent graduate who works part-time, and she has Type 1 diabetes. Decl. of Nieves Aragon, Ex. 1 to Pls.' Mot. [Dkt. # 9-2] ("Aragon Decl.") ¶¶ 3–6. Based on her experience, "juice boxes and small cans of soda" are the quickest and most reliable way to get her blood sugar under control, and Colorado's pilot project limits her ability to purchase those beverages. *Id.* ¶¶ 8–11.

- Plaintiff Craig has diabetes and kidney issues, and Iowa's complicated restrictions prevent him from consistently buying foods that help him manage his health needs, such as pre-packaged salads and sandwiches. Decl. of Marc Craig, Ex. 2 to Pls.' Mot. [Dkt. # 9-3] ("Craig Decl.") ¶¶ 9, 19–26, 34. Craig must also maintain proper hydration to manage his kidney disease, but the restrictions prevent him from doing so with Pedialyte or Gatorade. *Id.* ¶¶ 31–33.

- Plaintiff Fleming has a chronic spine condition and chronic insomnia, and he is allergic to most plants and plant products. Decl. of Nathan Fleming, Ex. 3 to Pls.' Mot. [Dkt. # 9-4] ("Fleming Decl.") ¶¶ 6–7. In light of the insomnia, Fleming needs to consume caffeine throughout the day to stay awake, but because he is allergic to coffee and tea, his dietician has recommended low or no sugar energy drinks. *Id.* ¶¶ 8–11. The Nebraska project bans all energy drinks, so Fleming can no longer purchase the recommended beverages. *Id.* ¶¶ 12–13.

- Plaintiff Johnson is the mother and conservator of a 19-year-old daughter who has been diagnosed with autism, obsessive compulsive disorder, an intellectual disability, and avoidant/restrictive food intake disorder ("ARFID"), and who requires "around-the-clock care." Decl. of Amanda Johnson, Ex. 4 to Pls.' Mot. [Dkt. # 9-5] ("Johnson Decl.") ¶¶ 3–47. ARFID causes her daughter "to only be able to eat a few 'safe' foods," all but two of which will be banned under the Tennessee pilot project. *Id.* ¶¶ 10–15. If she cannot access her safe foods, she will not be able to eat and will have to receive nutrition through a feeding tube. *Id.* ¶ 9.

- Plaintiff Starks works part-time, attends school full-time, and is the single-parent of a nine-year-old child. Decl. of Hunter Starks, Ex. 5 to Pls.' Mot. [Dkt. # 9-6] ("Starks Decl.") ¶¶ 4–5. Between three eight-hour shifts a week, childcare, school, and schoolwork, Starks drinks soda in the afternoon for energy. *Id.* ¶¶ 9–13. The West Virginia pilot project prohibits the purchase of soda, which has impacted Starks' ability to focus on work and school. *Id.* ¶ 14.

Though defendants "acknowledge that an outright 'depriv[ation] of SNAP benefits' constitutes cognizable Article III injury," they argue that plaintiffs do not suffer injury in fact because, "regardless of [their] unique dietary needs . . . , the pilot programs do not prevent them from purchasing those food items with other funds." Defs.' Cross-Mot. at 7–8; *see id.* at 8 ("The pilot programs have changed neither the supply of the food items [p]laintiffs desire nor the price.").

But that reassurance misunderstands and mischaracterizes plaintiffs' predicament. Plaintiffs all live below the poverty line, *see, e.g.*, Aragon Decl. ¶ 4 (earning $1,300 a month to support her and her five-year-old son),[4] and SNAP benefits made it possible for them to purchase the foods and beverages that aided their health and wellness. But under the pilot projects, SNAP no longer covers those items, slashing that portion of their benefits and raising the price of the items from $0 to full cost. That not only injures plaintiffs by depriving them in part of a

4 *HHS Poverty Guidelines for 2026*, Off. of the Assistant Secretary for Planning and Evaluation, https://perma.cc/QKZ3-T8PB.

governmental benefit they previously enjoyed, but it affects their finances and health because they must now take money out of already limited budgets to pay for the items, if they can at all. *See e.g.*, Fleming Decl. ¶ 15 ("Since the food restriction waiver went into effect . . . , I have been taking money out of my gas budget to be able to buy the energy drinks I need."); Johnson Decl. ¶¶ 17–19 ("I don't know how I will manage to feed my daughter once the waiver goes into effect. SNAP is the only money we have to buy groceries. We barely have enough money to pay all of our essential expenses . . . . If I cannot use SNAP to buy my daughter's food, I will have to run up a credit card balance, sell some of my possession on eBay, or not to pay one of our bills."). That is a "concrete" injury that "actually exists" for each plaintiff and gives them a real, and not hypothetical interest in the outcome of the case, which is not diminished by defendants' blithe suggestion that plaintiffs are free to use "other funds" to purchase the items; plaintiffs are SNAP recipients precisely because they do not have sufficient funds for food in the first place.[5]

5 In both oral argument and briefing, the government defendants have asserted, with respect to the plaintiffs with diabetic needs, that "there are plenty of fruits and other food options that can be purchased with benefits that can help boost blood sugar." Defs.' Cross-Mot. at 9, citing A.R. 113, 342; March 20 Hr'g Tr. [Dkt. # 23] at 12:15–17 ("There are things like bananas. I know people with Type 1 diabetes who eat bananas to keep their blood sugar up, and those are still eligible under SNAP."). Maybe so. But there is nothing in the record to indicate how plentiful these substitutes may be in plaintiffs' communities, or whether this armchair analysis is realistic given the comparative cost of fresh fruit against the snacks and drinks these plaintiffs rely upon. Furthermore, there is nothing in the record to support counsels' analysis. There is indeed no indication in the administrative record that any state looked into the availability of substitutes for SNAP recipients with unique health needs. And the portions of the record that the federal defendants did cite do not address the availability of alternative products. *See* Defs.' Cross-Mot. at 9, citing A.R. 113, 342. They cited: (1) a question from a draft "SNAP Waiver Client Individual Survey" asking whether the SNAP recipient purchased fruits and vegetables, A.R. 133; and (2) a page of a study explaining that it sought to simulate the effects of "how price affects consumption (price elasticities) and how reductions in purchasing power affect consumption (marginal propensity to consume) into a microsimulation computer model that simulates how changes in food consumption alter body mass index and risk of type 2 diabetes." A.R. 342.

Relying heavily on *Weissman v. National R.R. Passenger Corp.*, 21 F.4th 854, 858 (D.C. Cir. 2021), defendants frame the injury as one of "consumer choice" and argue that the pilot projects' do not cause injury because they do not meaningfully abridge that choice with regards to the restricted foods and beverages. Defs.' Cross-Mot. at 8; Defs.' Reply at 1–4.

But *Weissman* is not on point with this case. *Weissman* involved plaintiffs who sought to prevent Amtrak from adding a mandatory arbitration term to its rail tickets, arguing that it "deter[red] them from riding Amtrak." 21 F.4th at 856. That is not at all akin to this case involving restrictions on a government benefit program that provides monetary relief to enable low-income individuals to buy food. And more importantly, the Court found that the *Weissman* plaintiffs failed to establish standing because the change to the ticket was "an ancillary term," and they did "not demonstrate how any harm from the mere existence of this ancillary term" caused them injury. *Id.* at 859–60. The change involved here is not "ancillary." The pilot projects remove categories of foods and beverages from the products that can be purchased with SNAP benefits, and plaintiffs have explained how the restrictions have affected them personally.

Therefore, the Court finds that the injury requirement of standing has been satisfied, and that it has subject matter jurisdiction to hear the case.

**II. The Court will grant summary judgment in favor of plaintiffs on Count One because defendants' approval of the pilot projects exceeded their statutory authority under 7 U.S.C. § 2026(b).**

Section 706(2)(C) of the Administrative Procedure Act authorizes the court to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

It is undisputed that the Secretary and the USDA approved each of the pilot projects in this case pursuant to their authority under 7 U.S.C. § 2026(b). The project request template that

the agency sent to the states began with an explanation of section 2026(b), and it directed them to review that portion of the statute, *see, e.g.*, A.R. 3, and all of the letters approving the projects invoked section 2026(b). *See, e.g.*, A.R. 16 ("The Colorado SNAP Food Restriction Waiver Demonstration Project . . . is approved in accordance with the requirements to operate demonstration projects under Section 17 [7 U.S.C. 2026] (b)(1)(B)(i), and Section 17 [7 U.S.C. 2026] (b)(1)(B)(ii).") (alteration in original).

Plaintiffs maintain that the approvals exceeded defendants' authority under section 2026(b) because the pilot projects do not fall within the category of projects authorized by that provision. Pls.' Mot. at 16–19; Pls.' Opp. at 6–11. This is because, according to plaintiffs, the pilot projects do not serve to "increase the efficiency of [SNAP] or improve the delivery of [SNAP]," they do not fall under any of the four "permissible purposes," and they lack the evaluation plan required under the section. *Id.* (alterations in original).

Whether an agency "has exceeded . . . its authority is a question of statutory construction." *Helicopter Ass'n Int'l, Inc. v. Fed. Aviation Admin.*, 722 F.3d 430, 433 (D.C. Cir. 2013). An agency cannot "act with the force of law without delegated authority from Congress," *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020), so "[t]he question . . . is not what the [agency] thinks it should do but what Congress has said it can do." *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 674 (D.C. Cir. 1973) (internal quotation marks and citation omitted). "[A]gency interpretations of statutes" are no longer "entitled to deference," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024), so courts apply the "traditional tools of statutory interpretation – text, structure, purpose, and legislative history," to determine statutory meaning. *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003).

The court "begin[s] with the plain text," *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1234 (D.C. Cir. 2026), as the "preeminent canon of statutory interpretation" is the assumption "that [the] legislature says in a statute what it means." *Janko v. Gates*, 741 F.3d 136, 169–40 (D.C. Cir. 2014), quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (alteration in original).

Title 7, section 2026(b)(1), "Pilot projects," begins:

> (A) The Secretary may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the supplemental nutrition assistance program and improve the delivery of supplemental nutrition assistance program benefits to eligible households, and may waive any requirement of this chapter to the extent necessary for the project to be conducted.

7 U.S.C. § 2026(b)(1)(A).

Section 2026(b)(1)(B) is entitled "Project requirements," and it states:

> (i) Program goal
>
> The Secretary may not conduct a project under subparagraph (A) unless—
>
> (I) the project is consistent with the goal of the supplemental nutrition assistance program of providing food assistance to raise levels of nutrition among low-income individuals; and
>
> (II) the project includes an evaluation to determine the effects of the project.
>
> (ii) Permissible projects
>
> The Secretary may conduct a project under subparagraph (A) to—
>
> (I) improve program administration;
>
> (II) increase the self-sufficiency of supplemental nutrition assistance program recipients;
>
> (III) test innovative welfare reform strategies; or

(IV) allow greater conformity with the rules of other programs than would be allowed but for this paragraph.

*Id.* § 2026(b)(1)(B)(i)–(ii).

In sum, section 2026(b) authorizes the Secretary to conduct pilot projects that might "increase the efficiency of the [SNAP] program and improve the delivery of [SNAP] benefits," as long as they are "consistent with" SNAP's goal of "providing food assistance to raise levels of nutrition among low-income individuals" and include the necessary evaluations, but the only "permissible projects" under this provision are ones that "improve program administration," "increase the self-sufficiency of [SNAP] recipients," "test innovative welfare reform strategies," or "allow greater conformity with the rules of other programs." *Id.* § 2026(b). Improving the health and diet of SNAP recipients is not included.

Defendants maintain, though, that the pilot projects "increase SNAP efficiency" because they improve "recipients' levels of nutrition for a constant level of benefits." Defs.' Reply at 1, 7–8; *see id*. at 8 ("[I]f USDA can achieve better health outcomes while awarding the same benefit amount, that would be 'efficient.'"). They contend that the projects "incentiviz[e] healthier food purchases," Defs.' Cross-Mot. at 13–14, and reason that because such an incentive is "synergetic" to the statute's policy of "safeguard[ing] the health and well-being of the Nation's population by raising levels of nutrition among low-income households," the projects serve to "increase the efficiency of [SNAP]." Defs.' Reply at 7–8, citing 7 U.S.C. § 2011.

But this is a non sequitur. Merely positing something does not make it so, and defendants' reading of the statute does not comport with the language of section 2026(b), the structure of the statutory scheme, or the legislative history behind the section.

The text of section 2026(b)(1)(A) is the starting point of the analysis. It authorizes the Secretary to conduct projects that might "increase the efficiency of the supplemental nutrition assistance program and improve the delivery of supplemental nutrition assistance program benefits to eligible households." 7 U.S.C. § 2026(b)(1)(A). "Efficiency" is defined as "[t]he quality or property of being efficient," and "efficient" means "[a]cting or producing effectively with a minimum of waste, expense, or unnecessary effort." *William Morris*, Am. Heritage Dictionary (1976).[6] While that definition by itself does not illuminate the section's meaning, "efficiency" does not appear alone in that sentence. The statute says, "increase the efficiency of the supplemental nutrition assistance *program*." 7 U.S.C. § 2026(b)(1)(A). Not increase the efficiency of the agency's ability to achieve "the program's goal" or the efficiency of "SNAP benefits," as the government submits. Defs.' Reply at 8–10. It speaks to testing new means of enhancing the efficiency of the SNAP program itself – administrative and programmatic ways to make it run more smoothly, to deliver benefits at a lower cost, to reduce bureaucratic steps or paperwork, etc.

The language of the rest of section 2026(b) comports with that reading. The sentence that authorizes the Secretary to conduct pilot projects has two prongs: she may conduct projects to test changes that "increase the efficiency" of SNAP or "improve the delivery" of SNAP benefits, 7 U.S.C. § 2026(b)(1)(A), the second of which is also a logistical, administrative goal. And the list of "[p]ermissible projects" in section 2026(b)(1)(B)(ii) is limited to projects that "improve program administration," "self-sufficiency" of SNAP recipients, test innovative "welfare reform

6 When interpreting statutory language, the Court must read plain text "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). The language at issue first appeared in the Food and Agricultural Act of 1977, Pub. L. No. 95-113, § 17(b)(1), 91 Stat. 913, 977, so the Court has used a dictionary from that period.

strategies," or "allow greater conformity with the rules of other programs." These purposes speak to the bureaucratic nature of the projects, or the work requirements that were added to the statutory scheme, as ones that affect the administrative elements of SNAP itself or other welfare programs. Nowhere does this portion of the statute say anything about SNAP's goals, good nutrition, obesity, or morbidity.

Finally, in section 2026(b)(v), Congress listed projects it would be appropriate to approve. It tells the Secretary that she may conduct:

> projects involving the payment of the value of allotments or the average value of allotments . . . by household size in the form of cash to eligible households all of whose members are age sixty-five or over or any of whose members are entitled to supplemental security income benefits under . . . the Social Security Act or are receiving assistance under a State program funded under . . . the Social Security Act . . . , the use of identification mechanisms that do not invade a household's privacy, and the use of food checks or other voucher-type forms in place of EBT cards.

*Id.* § 2026(b)(1)(B)(v). All of these examples flow directly from the authority to approve pilot projects set forth in section 2026(b)(1)(A), addressing how the benefits are administered and how they interact with other social programs.

Defendants' expansion of the term of "efficiency" beyond its commonly understood meaning to include projects that "achieve better health outcomes," Defs.' Reply at 8, cannot be squared with the rest of the statutory scheme either. First and foremost, Congress expressly gave the Secretary the power to conduct "[p]ilot projects to evaluate health and nutrition promotion in the [SNAP] program" in a completely different part of the statute – section 2026(k). That section authorizes the Secretary to "carry out . . . pilot projects to develop and test methods":

> (A) of using the supplemental nutrition assistance program to improve the dietary and health status of households eligible for or participating in the supplemental nutrition assistance program; and

(B) to reduce overweight, obesity (including childhood obesity), and associated co-morbidities in the United States.

7 U.S.C. § 2026(k).

That is exactly the stated purpose of the projects in this case. The newly appointed Secretary's letter called upon state and local governments to "propose bold ideas" and specifically invited "much-needed reforms to nutrition assistance programs to promote . . . healthy eating habits to ensure our citizens live longer, more abundant lives." A.R. 193–94. The USDA template that the agency circulated to facilitate the states' proposals stated that the projects were intended to "strengthen State strategies to encourage healthy choices, healthy outcomes, and healthy families." A.R. 3. And all of the planned project evaluations and participant surveys were focused on what SNAP participants were eating and buying.[7] Although a few states paid lip service to the purpose of "efficiency," *see* A.R. at 28 ("SNAP is inefficient at delivering on purpose of 'promoting general welfare and safeguarding health and well-being' and 'alleviating malnutrition' because [it] does not regulate the types of

7 Plaintiffs also took issue with the substance, or lack of substance, in the evaluations and planning documents themselves, *see, e.g.*, Pls.' Mot. at 18–21, but the Court need not address those issues in light of its ruling on defendants' lack of statutory authorization.

items that can be purchased with SNAP benefits."), it is clear from each project request that the states' objective was to combat health, diet, and obesity-related issues.[8]

So why would defendants ignore the portion of section 2026 that gives them clear statutory authority to conduct pilot projects to advance this objective? Because projects approved under section 2026(k) are required to meet more stringent mandatory criteria. *See* 7 U.S.C. § 2026(k)(2)(c) (detailing the criteria the Secretary must evaluate to approve a project). And more importantly, section 2026(k) does not authorize the Secretary to waive requirements of the Food and Nutrition Act to conduct its type of projects, meaning that defendants would not be authorized to waive the statutory definition of "food." Subsection (k) expresses the Congressional preference that the Secretary utilize other means to accomplish that goal, as it specifically authorizes projects that:

> (C) provide incentives to authorized supplemental nutrition assistance program retailers to increase the availability of healthy foods to participating households;

---

8 *See* A.R. 9 ("Supporting the health of Coloradans is of paramount importance. The proposed package of changes in this waiver request ensures that SNAP dollars are not being spent on sweetened beverages with no or negative nutritional value and that SNAP participants can instead spend those SNAP dollars on foods that provide meaningful nutritional support."); A.R. 52 ("The Nebraska Healthy SNAP waiver to omit soda and energy drinks from the SNAP-eligible purchase list is just one more step in the right direction toward making Nebraska healthy again. Through this restriction households are expected to use SNAP benefits to purchase healthier beverages to improve their overall health."); A.R. 63 ("[Tennessee]'s goal is to promote healthier eating habits among participants, supporting improved health outcomes and reducing diet-related conditions by encouraging the use of SNAP benefits for more nutritious food options."); A.R. 28 ("Iowa wishes to refocus the SNAP program on its designed intent, 'to promote the general welfare and safeguard the health and wellbeing' by encourage[ing] SNAP participants to purchase healthier food items . . . ."); A.R. 79 (explaining that West Virginia's "long-term intended outcome is for SNAP households to transition to healthy drink options, and produce positive health impacts as a result"). The two amicus briefs submitted also highlight the pilot projects' health, nutrition, and obesity related goals. *See* States' Amicus Br. at 6 ("Amici States created the subject pilot projects for the very purpose of advancing SNAP's goal—to raise the nutrition levels of low-income individuals by cutting out innutritious junk food."); Foundation Amicus Br. at 8 ("Without the waivers, taxpayer dollars will continue to fund an obesity epidemic.").

> (D) subject authorized supplemental nutrition assistance program retailers to stricter retailer requirements with respect to carrying and stocking healthful foods; [or]
>
> (E) provide incentives at the point of purchase to encourage households participating in the supplemental nutrition assistance program to purchase fruits, vegetables, or other healthful foods . . . .

7 U.S.C. § 2026(k)(3).

Congress defined what "food" is supposed to be, and it did not authorize the agency to amend or waive the definition it enacted. It did not authorize the agency to cut types of food out of SNAP entirely. It set out clearly the type of experimental projects that could be tested to address the unquestionably serious health issues attributed to the rise of obesity in the population in general and particularly the low-income population. But it did not invite the Secretary to ignore its directives by trying to advance those ends under the banner of "efficiency" or administrative improvements.

Defendants argue that section 2026(b) and section 2026(k) can be read together because "[s]ection 2026(k) mandates the use of pilot projects that can support dietary health and nutritional goals" in "specific circumstances," and "[s]ection 2026(b) . . . is based on permissive authority to conduct a much broader range of projects." Defs.' Suppl. Mem. at 1. According to them, "[t]hat distinction evinces a clear congressional effort to more forcefully encourage certain kinds of projects, such as those enumerated at [section] 2026(k)(3), while nevertheless permitting the Secretary to pursue a broader range of projects at her discretion." *Id.* at 5.

But that strained reading is unpersuasive and illogical, and it further highlights the flaws in defendants' reading of the statute. First, it would be absurd for Congress to tell the Secretary that she "may" conduct health and nutrition related projects however she wants under section 2026(b), but that she "must" conduct the same types of projects with more stringent requirements

under section 2026(k). And even if Congress were attempting to "more forcefully encourage certain kinds of projects," why wouldn't Congress add the "certain kinds of projects" to section 2026(b) itself? Section 2026(b) includes subsection suggesting "additional included projects" the Secretary may conduct under that authority, *see* 7 U.S.C. § 2026(b)(1)(B)(v), but the types of projects in section 2026(k) are not listed. In other words, if the Secretary needed no new authority to approve section 2026(k) projects, why add a separate section at all?

Further, defendants' interpretation of the relationship between sections 2026(b) and (k) runs counter to "the old and familiar rule" of statutory construction that "the specific governs the general." *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 638 (D.C. Cir. 2021), quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012). As the Supreme Court has explained:

> The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one. But the canon has full application as well to statutes . . . in which a general authorization and a more limited, specific authorization exist side-by-side. There the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, violating the cardinal rule that, if possible, effect shall be given to every clause and part of a statute. The terms of the specific authorization must be complied with.

*RadLAX Gateway Hotel, LLC*, 566 U.S. at 645 (internal quotation marks, alterations, and citations omitted).

"[T]he general-specific canon is particularly appropriate where . . . the provisions at issue are 'interrelated and closely positioned' as 'parts of the same statutory scheme,'" *Genus Med. Techs. LLC*, 994 F.3d at 638, and where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Patten v. District of Columbia*, 9 F.4th 921, 926 (D.C. Cir. 2021). So even if the Court were to read section 2026(b) as a broad

authorization and section 2026(k) as a specific one, it would still be subsection (k) that governs. *See D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment.").

Finally, the legislative history supports the Court's reading of section 2026(b) as authorizing the Secretary to conduct projects related to administrative efficiency only, and section 2026(k) as the only provision authorizing pilot projects related to health and nutrition. Although the authorization for pilot projects in section 2026(b) did not exist in the original Food Stamp Act, Congress added it into the statutory scheme through the Food and Agriculture Act of 1977, which read:

> The Secretary is authorized to conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the food stamp program and improve the delivery of food stamp benefits to eligible households, including projects involving the payment of the value of allotments in the form of cash to eligible households all of whose members are either age sixty-five or over or entitled to supplemental security income benefits under title XVI of the Social Security Act, . . . the use of countersigned food coupons or similar identification mechanisms that do not invade a household's privacy, and the use of food checks or other voucher-type forms in place of food coupons. The Secretary may waive the requirements of this Act to the degree necessary for such projects to be conducted, except that no project shall be implemented which would lower or further restrict the income or resource standards or benefit levels provided pursuant to sections 5 and 8 of this Act.

Food and Agricultural Act of 1977, Pub. L. No. 95-113, § 17(b)(1), 91 Stat. 913, 977. Like the current version of the statute, this provision used terms like "efficiency" and "delivery," juxtaposed with specific examples of administrative improvement, and it was devoid of any mention of pilot projects aimed at nutrition or health.

The legislative history around this provision in the 1977 bill is not expansive, but it confirms the limited nature of the power granted to the Secretary under section 2026(b). As a report from the House of Representatives explained:

> The Committee bill would authorize pilot or experimental projects in one or more areas of the country, but on two conditions – first, that they only test changes that improve benefit delivery to eligible households and increase program efficiency, and second, that they not lower or restrict any of the income or asset tests or the benefit levels . . . . These limitations would protect the current program by making it exceedingly difficult to displace law with discretion.

H.R. Rep. No. 95-464, at 363 (1977).

After the 1977 legislation, the next significant change to the text of section 2026(b) came about in 1996 when Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act. That Act struck most of section 2026(b)(1)(A) to leave it looking much as it does today:

> The Secretary may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the food stamp program and improve the delivery of food stamp benefits to eligible households, and may waive any requirement of this chapter to the extent necessary for the project to be conducted.

Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, § 850, 110 Stat. 2105, 2336–37.

The legislative history surrounding this change largely parrots the statutory change with little comment, but it does not in any way indicate a broadening of the authority Congress previously invested in the Secretary:

> The conference agreement adopts the House provision with an amendment. The Secretary is permitted to conduct pilot and demonstration projects and waive Food Stamp Act requirements to the extent necessary, with certain limitations and conditions. Projects must be consistent with the food stamp program goal of providing food assistance

> to raise levels of nutrition among low-income individuals and must include an evaluation. Permissible projects are those that will improve the administration of the program, increase self-sufficiency of food stamp participants, test innovative welfare reform strategies, or allow greater conformity with the rules of other programs than is otherwise allowed under the Food Stamp Act.

H.R. Rep. No. 104-725, at 479 (1996) (Conf. Rep.); *see also* H.R. Rep. No. 104-651, at 81 (1996). And although Congress noted the requirement that the projects must be "consistent with" the goal of the then-food stamp program, this is also where it added in the four permissible purposes under section 2026(b)(1)(B)(iii) – which cabined the Secretary's authority to "administration," "self-sufficiency," and "welfare reform strategies," not the nutrition or health of SNAP participants.

Finally, in 2008, section 2026(k) was added to the statute through the Food, Conservation, and Energy Act:

> Section 17 of the Food and Nutrition Act of 2008 (7 U.S.C. 2026) is amended by adding at the end the following:
>
> "(k) PILOT PROJECTS TO EVALUATE HEALTH AND NUTRITION PROMOTION IN THE SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM.—
>
> "(1) IN GENERAL.—The Secretary shall carry out, under such terms and conditions as the Secretary considers to be appropriate, pilot projects to develop and test methods—
>
> "(A) of using the supplemental nutrition assistance program to improve the dietary and health status of households eligible for or participating in the supplemental nutrition assistance program; and
>
> "(B) to reduce overweight, obesity (including childhood obesity), and associated co-morbidities in the United States."

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, § 4141, 122 Stat. 923, 1117.

Here, the legislative history is more abundant. As the conference report from the House of Representative explained:

> The House bill amends section 17 . . . by adding a new section that authorizes the Secretary to establish a demonstration program, to be known as the "Initiative to Address Obesity Among Low-Income Americans," to develop and implement strategies to reduce obesity among low-income Americans.
>
> * * *
>
> The Senate amendment amends section 17 to require and fund pilot projects to develop and test methods of using the Food and Nutrition program to improve the dietary and health status of participants and to reduce overweight, obesity, and associated co-morbidities. Among other initiatives, projects may include . . . point-of-purchase incentives to encourage program participants to buy fruits, vegetables, and other healthy foods . . . .

H.R. Rep. No. 110-627, at 779 (2008) (Conf. Rep.). As Senator Harkin (Iowa-D) explained:

> The bill also includes $20 million in the nutrition title for pilot projects to test innovative ways of using the Supplemental Nutrition Assistance Program to improve the diets and overall health of recipients and to especially reduce the problems of obesity and the related bad health outcomes. **Particularly, this funding is provided for USDA to carry out a pilot program that would test whether certain incentives can be effective in helping food stamp households to purchase healthier foods.** The funding is intended to be used for a pilot program using the existing EBT infrastructure. For example, a participating household that purchases fruits and vegetables with their food stamp benefits would receive a discount on the portion of their purchase that is deemed healthful. Or alternatively, the household would have extra benefits added onto its EBT card for the component of their grocery store purchases that are healthful.

154 Cong. Rec. S4754 (daily ed. May 22, 2008) (statement of Sen. Tom Harkin) (emphasis added).

Thus, the legislative history tells the same story as the plain text and the structure of the statute: Congress gave the Secretary authority to approve pilot projects related to administrative efficiency of the then-food stamp program, it cabined that authority to certain related purposes, and then, when it wanted the Secretary to start addressing the "dietary and health status of participants," it "add[ed] a new section that authorize[d]" the Secretary to do so. H.R. Rep. No. 110-627, at 779. None of that indicates that the Secretary already had authority under section

2026(b) to carry out pilot projects that change the definition of "food" to "raise the nutrition level" in the name of efficiency.

Under the appropriate reading of the statute, none of the state plans or USDA approvals indicate that the pilot projects might "increase the efficiency" of the SNAP program within the meaning of the statute. As plaintiffs' point out, the projects actually add administrative complexity, as both SNAP participants and retailers must deal with new rules affecting what can and cannot be purchased. *See* Pls.' Opp. at 9. Though some state restrictions are simpler to understand, such as Colorado's restriction on "soft drinks," others are not. A.R. 17. Iowa's project restricts "all taxable food items as defined by the Iowa Department of Revenue," which includes several categories of food and beverage items that had to be laid out in a chart. A.R. 42–43.

Even the federal government had to issue further "Clarifications on Food Restriction Waivers and Retailer Compliance." It sent a memorandum out on December 30, 2025, one business day before the first pilot projects in this case started on January 1, 2026, explaining that:

> All walk-in SNAP retailer stores physically located within a State implementing a SNAP Food Restriction Waiver must comply with the State's waiver for all SNAP transactions . . . . Certain other retailers are also required to comply when fulfilling online orders from a warehouse (fulfillment center), regardless of their location. When a SNAP participant from an implementing State places an online order using SNAP benefits and the retailer fulfills any part of the order from a warehouse, the retailer must comply with the restrictions of that participant's State . . . . This applies to all transactions in which the order is fulfilled from a warehouse not open to customers, whether shipped directly to the customer's address or to a designated pick-up location. Some retailers will therefore be required to comply with multiple States' waivers. Retailers fulfilling orders from warehouses can use the State-issued SNAP EBT card's Bank Identification Number (BIN) to determine SNAP participants' States.

A.R. 184. So while "Iowa, Nebraska, and Colorado each have an approved SNAP Food Restriction Waiver," the warehouse fulfilling the online order must "must comply with: Iowa's

waiver for purchases made with an Iowa EBT card; Nebraska's waiver for purchases made with a Nebraska EBT card; and Colorado's waiver for purchases made with a Colorado EBT card." A.R. 184. That scheme certainly does not reflect programmatic efficiency.

Because the pilot projects in this case did not satisfy the requirements of section 2026(b), the Secretary and the USDA exceeded their authority under that section of the statute in approving them. Therefore, the Court will set the approvals aside under section 706(2)(C) of the APA, and the agency will have to go back to the drawing board to design pilot projects that accord with the statute.[9]

## III. The Court will grant summary judgment in favor of plaintiffs on Count Three because defendants failed to meet the requirements of 7 C.F.R. § 282.1(b) before the initiation of the pilot projects in Iowa, Nebraska, West Virginia, and Colorado.

Section 706(2)(D) of the APA authorizes the court to set aside agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

"It is 'axiomatic,' . . . 'that an agency is bound by its own regulations.'" *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014), quoting *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979). Under USDA regulation 7 C.F.R. § 282.1(b):

> At least 30 days prior to the initiation of a demonstration project, [the USDA] shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public. The notice shall set forth the specific operational procedures and shall explain the basis and purpose of the demonstration project. If significant comments are received in response to this General Notice, the Department will take such action as may be appropriate prior to implementing the project. If the operational procedures contained in the General Notice

9 The Court notes that Congress appeared to contemplate that this would be accomplished through *incentives*, and there appears to be no statutory authorization for blanket restrictions with no exceptions for individual circumstances on any categories of food not already carved out of the statutory definition of "food."

> described above are significantly changed because of comments, an amended General Notice will be published in the Federal Register at least 30 days prior to the initiation of the demonstration project, except where good cause exists supporting a shorter effective date. The explanation for the determination of good cause will be published with the amended General Notice. The amended General Notice will also explain the basis and purpose of the change.

Iowa, Nebraska, and West Virginia launched their pilot projects on January 1, 2026, and Colorado started on April 30, 2026. *See* A.R. 23, 40, 57, 94. So, under section 282.1(b), the USDA was required to post notices in the Federal Register setting out the "specific operational procedures," as well as the bases and purposes of the projects, by December 1, 2025 for Iowa, Nebraska, and West Virginia, and April 1, 2026 for Colorado.

It is undisputed that defendants did not post any notice in the Federal Register of the pilot projects. They maintain that they were not required to satisfy section 282.1(b) because they "reasonably concluded" that projects were not likely to have a "significant impact on the public." Defs.' Cross-Mot. at 20–21. They cite their own explanation in a December 30, 2025 memorandum titled "Food Restriction Waivers and General Notice Rule" as support for this conclusion:

> To date, [the agency] has approved 18 State agencies to implement SNAP demonstration waiver projects that temporarily waive the definition of SNAP eligible foods, referred to as SNAP Food Restriction Waivers. [The agency] has approved these 18 State agencies to restrict the food items that SNAP households can purchase using SNAP benefits. Each State agency's waiver is unique, but generally restricts non-nutritious, accessory food items such as sweetened beverages, candies, and prepared desserts.
>
> * * *
>
> SNAP has determined that the General Notice Rule of 7 CFR 282.1(b) is not applicable to the Food Restriction Waivers. Food Restriction Waivers will limit the accessory food items that SNAP households residing in implementing States can purchase with SNAP, but they will not change SNAP eligibility criteria, allotment levels or access to staple foods. Moreover, SNAP benefits are supplemental, calculated to cover only 70

> percent of the household's monthly food budget. SNAP households will remain free to use cash to purchase SNAP restricted items.

A.R. 190 ("December 30 memorandum"). And they argue that because this conclusion is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), no notice was required for the projects. Defs.' Cross-Mot. 21–22.

As defendants point out, *Auer* called for deference to an agency's interpretation of its own regulations. Defs.' Cross-Mot. at 21; *Auer*, 519 U.S. at 459–63. In *Auer*, the Court dealt with whether the Secretary of Labor "reasonably interpreted" its "salary basis-test" to deny the plaintiffs an employment status that would entitle them to overtime pay. *Id.* at 454–55, 459–63. The Court held that "[b]ecause the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is . . . controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Id.* at 461. The Secretary "easily met" that "deferential standard," *id.* at 462, and courts have continued to refer to the practice of deferring to an agency's reasonable reading of an ambiguous regulation as "*Auer* deference." *Kisor v. Wilkie*, 588 U.S. 558, 563 (2019), citing *Auer*, 519 U.S. at 452.

But when the Supreme Court addressed the question of whether it should overrule *Auer* in its more recent decision in *Kisor v. Wilkie*, 588 U.S. 558 (2019), it thoroughly explained and cabined the application of *Auer* deference. *Id.* at 563. *Kisor* made clear that "*Auer* deference is not the answer to every question of interpreting an agency's rules," and it laid out a three-part analysis for determining whether the deference should be applied. *Id.* at 573–81.

"First and foremost," the court must determine whether the regulation at issue is "genuinely ambiguous" because "the possibility of deference can arise only if a regulation is genuinely ambiguous." *Id.* at 573, 574–75. "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means – and the court must give it

effect, as the court would any law." *Id.* at 574–75; *see id.* at 575 ("[I]f there is only one reasonable construction of a regulation – then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense."). "[A] court must exhaust all traditional tools of construction" to determine whether a regulation is genuinely ambiguous, "carefully consider[ing]" its "text, structure, history, and purpose." *Id.* at 575 (internal quotation marks and alteration omitted). *Kisor* opined that "[d]oing so will resolve many seeming ambiguities out of the box, without resort to *Auer* deference." *Id.*

Second, even if there is genuine ambiguity to the regulatory language, "the agency's reading must still be reasonable." *Id.* (internal quotation marks omitted). As *Kisor* pointed out,

> Some courts have thought . . . that at this stage of the analysis, agency constructions of rules receive greater deference than agency constructions of statutes. . . . But that is not so. . . . [T]he agency's reading must fall "within the bounds of reasonable interpretation." . . . And let there be no mistake: That is a requirement an agency can fail.

*Id.* at 576, quoting *Arlington v. FCC*, 569 U.S. 290, 296 (2013).

Finally, *Kisor* explained that "not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference," and it directed courts to consider three "especially important markers for identifying when *Auer* deference . . . is not appropriate." *Id.* First, "[t]he regulatory interpretation must be one actually made by the agency. In other words, it must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." *Id.* at 577. "Next, the agency's interpretation must in some way implicate its substantive expertise." *Id.* "Finally, an agency's reading . . . must reflect 'fair and considered judgment' to receive *Auer* deference." *Id.* at 579. "That means . . . that a court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Id.*

In light of that guidance, the Court finds that defendants' assertion that section 282.1(b) is inapplicable to the approval of the pilot projects is not entitled *Auer* deference.[10]

What begins and ends the inquiry is the plain language of section 282.1(b), since it is not "genuinely ambiguous." The section states that the USDA must post notice of the project to the Federal Register if it "will likely have a significant impact on the public." 7 C.F.R. § 282.1(b). None of those words are defined by the regulation or the Food and Nutrition Act, so the Court looks to the plain meaning of the text. *See Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F.4th 297, 306–07 (D.C. Cir. 2023) ("Text comes first."). "Significant" means "[h]aving or expressing a meaning," "meaningful," or "[i]mportant; notable; valuable." William Morris, *Am. Heritage Dictionary* (1976). "Impact" is "[t]he effect of one thing upon another." *Id.* And "public" is "[t]he community or the people as a whole." *Id.* As anyone reading the regulation would understand, the USDA is required to post notice of a proposed project in the Federal Register when it is likely to have meaningful effect on the people or community within its reach.

Defendants do not argue that "significant impact on the public" should be read differently, or in any particular way. They simply offer their assessment that the projects would

---

10 Plaintiffs raised the question of whether *Auer* deference survives the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which overruled the previous deference afforded to an agency's interpretation of ambiguous statutory language under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Pls.' Opp. at 28 n.6. But the Court agrees with the others in this district that have held that *Auer* deference "survives *Loper Bright* . . . , since it concerns an agency's interpretation of its own regulations rather than that of a statute." *Campaign Legal Ctr. v. Fed. Elec. Comm'n*, Civ. Action No. 24-2585, 2025 WL 1768099, at *7 (D.D.C. June 26, 2025); *see, e.g.*, *Battineni v. Mayorkas*, 752 F. Supp. 3d 195, 207 n.3 (D.D.C. 2024) ("The Supreme Court's recent decision in *Loper Bright* . . . does not affect [*Auer*'s] deferential standard. *Loper Bright* presented an issue of an agency's interpretation of a statute, not of its own regulations."). It also notes that the D.C. Circuit recently applied the *Kisor* analysis to an agency's regulatory interpretation in a case that post-dates *Loper Bright*. *See Alon Refining Krotz Springs, Inc. v. EPA*, 172 F.4th 12, 17–20 (D.C. Cir. 2026) (deciding whether the EPA's interpretation of a regulation regarding "small refineries" was entitled to deference).

not give rise to a "significant impact" because they would "not change SNAP eligibility criteria, allotment levels[,] or access to staple foods.'" Defs.' Cross-Mot. at 20–21, citing 7 U.S.C. §§ 2011–2017.

The problem with that conclusion is that the USDA focused its analysis, which was limited in the first place, almost exclusively on the impact the projects would have on the SNAP program. But the plain language of the regulation does not direct the agency to consider impact on the program; it directs the agency to consider whether the project will have a significant impact on the *public*. And though the agency framed its conclusion around what the projects did not do, *i.e.*, effect eligibility, total benefit calculation, or the ability to buy "nutritious food," when one looks at what the projects sought to accomplish, there is no doubt that they were likely to have a significant impact on the public. Indeed, that is the whole *point* of the pilots.

The likelihood is confirmed by the documentation in the administrative record related to the purpose of the projects, their scope, and the activities necessary to implement them. First, the press releases in the record and the project requests themselves reflect the significance of the problem the USDA and the states sought to tackle. On April 8, 2025, a month into her tenure as Secretary, Rollins and Secretary of Health and Human Services Robert F. Kennedy Jr. detailed the problem the administration was taking on in a co-authored opinion piece. A.R. 254. The article explained that the obesity and chronic illness rate among school-aged children and adolescents constituted a "health crisis threatening to upend the lives of American families for generations." A.R. 255. To combat this "crisis," the Secretaries "call[ed] on all governors to submit waivers to help promote access to . . . critical sources of nutrition, including waivers that can limit what can be purchased with food stamps." A.R. 258.

Secretary Rollins published another article on December 15, 2025, right in the middle of the notice period required by section 282.1(b) for the projects in Iowa, Nebraska, and West Virginia, stating:

> The chronic disease epidemic does not respect partisan boundaries, and never before has it presented such an enormous threat to our national welfare.
>
> The urgency of the crisis is abundantly clear. Just consider what America's youth are up against.
>
> According to the Centers for Disease Control and Prevention, over 40 percent of the roughly 73 million children (aged 0–17) in the United States have at least one chronic health condition, and over 350,000 American children have been diagnosed with diabetes.
>
> These troubling statistics represent a threat not just to those personally suffering from the health crisis but to U.S. national security. More than 75 percent of American youth (aged 17–24) are ineligible for military service – primarily due to obesity, poor physical fitness and/or mental health challenges.
>
> Rising rates of childhood chronic disease are likely being driven by a combination of factors. However, according to the Department of Agriculture's most recent data, 15.6 million children are recipients of the SNAP program – accounting for about 39 percent of all SNAP participants – so improving this program is a terrific place to start.
>
> For too long, sugary drinks were the No. 1 item purchased with SNAP benefits. Not vegetables, not fruit, but soda. The Trump administration is partnering with governors from across the country to remedy that and improve health outcomes.

A.R. 283–84. Because of this state of affairs, "the Department of Agriculture [was] empowering states with unprecedented flexibility to manage their nutrition programs." A.R. 283.

The pilot project requests sent in response to the Secretary's call further reflect the significant nature of the issue. Nebraska stated that it was "experiencing a health epidemic further induced by diet-related chronic disease," and that "[n]otably, the diet quality of SNAP families has worsened over the past decade regardless of incentive programs and nutrition

education." A.R. 51–52. West Virginia also stated that it was "experiencing a health epidemic of obesity and other chronic diseases such as type 2 diabetes and heart disease resulting from consumption of foods with high sugar content," and that "[a]llowing SNAP benefits to be used for the purchase of nutritionally void, sugar-sweetened beverages may be contributing to these preventable health conditions and their associated costs." A.R. 80–81.

Iowa's request similarly expressed that

> [S]ugar-sweetened beverages are the leading source of added sugar in the American diet and provide little to no nutritional value. These beverages are associated with weight gain, obesity, type 2 diabetes, heart disease, kidney diseases, non-alcoholic liver disease, tooth decay and cavities, and gout.
>
> Iowa wishes to refocus the SNAP program on its designed intent, "to promote the general welfare and safeguard the health and wellbeing" by encourage[ing] SNAP participants to purchase healthier food items . . . .

A.R. 28. And Colorado's request stated:

> Supporting the health of Coloradans is of paramount importance. The proposed package of changes in this waiver request ensures that SNAP dollars are not being spent on sweetened beverages with no or negative nutritional value and that SNAP participants can instead spend those SNAP dollars on foods that provide meaningful nutritional support. This expands not only the positive nutritional and health impact of SNAP benefit spending but also enhances the impact of the purchasing power of a household's SNAP benefits.

A.R. 9–10. So it was clear that both the federal government and the states viewed the issue the pilot projects would tackle as immense, impending, and important.

The second indication in the record that the projects were likely to significantly impact the public was their scope. To tackle the widespread problem of obesity and diet-related chronic disease, the states did not mince words. As West Virginia put it:

> As of March 2025, West Virginia had a statewide SNAP caseload of 146,488 households and 273,981 individual recipients. **100% of WV's SNAP caseload will be affected by this waiver.** The waiver will span

> the entire population as well as including both metropolitan and rural areas for all ages.
>
> * * *
>
> **This waiver will impact all SNAP retailers (2,118) in West Virginia.** All retailers must comply within 12 months of the waiver implementation date, or they will not be eligible to be SNAP retailers.

A.R. 81–82 (emphasis added).

And the USDA echoed the broad reach of the program when it approved it:

> Eligibility: This Project will apply to the entire West Virginia SNAP population (100 percent of the SNAP caseload).
>
> Opt-Out: No SNAP household in West Virginia may opt out of the SNAP eligible food restrictions project. The purpose of the Project is to evaluate the impact of excluding soda from eligible purchases under SNAP on participant's consumption of these products and enhance the nutrition, and therefore the health, of low-income families.

A.R. 93–94. Defendants approved each pilot project under the same terms: total coverage of SNAP recipients and retailers in the state with no opt-outs for any reason. A.R. 16, 41–42, 56, 70.

One simply cannot argue that a program designed to affect all of the 273,981 SNAP recipients in just one state does not have a significant impact on the public. And West Virginia is a small state.

The other aspects of the projects that reflect their anticipated impact on the public are the intensive public education effort that preceded them and the evaluation effort to follow them. Although some of the project requests were more robust than others, all included plans for communicating the restrictions to retailers and participants, as well as plans for compliance. West Virginia, for example, planned to require all SNAP retailers "to implement point-of-sale . . . system changes" that would "adjudicate[] items on a per-transaction basis, authorizing or denying each item based on a restricted product list defined by the State." A.R. 82. It also

included a multi-step communication plan to retailers and participants. A.R. 84. And because it "fores[aw] increases in call volume, constituent services inquiries, media inquiries, and additional social media information," it "committed to helping SNAP households over the hurdle of this new waiver" by utilizing educational resources. A.R. 83.

The USDA's approval letters called for even more preparation, requiring each state to provide "finalized . . . plan[s] detailing task and timelines" for: "engaging with and notifying SNAP-authorized retailers," "compliance and monitoring" for SNAP retailers, and "notifying and educating SNAP households." A.R. 18–20, 35–36, 57–58, 72–73, 95–96. To this, Nebraska submitted a detailed, eight-month plan for communicating the project to SNAP participants, beginning with initial press releases in May 2025 and ending with a text message campaign, individual letters, and in-person meetings with community agencies in December 2025. A.R. 123–25. It did the same for its plan to communicate the project to retailers, its plan to monitor those retailers, and its plan to evaluate the project's impact. A.R. 126–58. Again, each state's responses varied in detail, but they all engaged in the preparation and planning activities it would take to warn SNAP retailers and participants about the changes they were about to make. Again, they would not have to do any of this if they were implementing something that was not expected to have a significant effect on the public.

The focus of the states' evaluation plans was particularly indicative on how the projects were going to impact the public. Iowa's proposed study would "survey and analyze participant shopping and eating patterns at pre, mid, and post checkpoints." A.R. 28. Colorado planned "to analyze participant food purchasing and consumption behaviors" before and after the implementation of the project. A.R. 10. West Virginia planned to look at "data on soda consumption trends before and after the restriction waiver," and it sought to "monitor trends in

the diagnosis and treatment of conditions closely associated with high consumption of sugar-sweetened beverages." A.R. 86. Nebraska planned for "to evaluate [SNAP participant] spending habits prior to the waiver implementation and in each quarter following." A.R. 53. And Tennessee planned to assess the "impact on program access" for customers and retailers, including "changes to the number and locations of approved retailers over time, and the State's customer experience survey [to] include questions that measure customer satisfaction." A.R. 67.

The USDA singled out evaluation as well. *See, e.g.* A.R. 15 ("Due to the novel design of the Project, FNS is committed to carefully and comprehensively evaluating how waiving the State's definition of food in this way impacts SNAP participants and retailers."). The agency's approval letters specifically directed:

> SNAP participants' surveys, at a minimum, will collect the following information:
>
> - Meals and foods eaten outside the home or with foods not purchased at SNAP-authorized retailers.
> - Purchase and/or consumption of less healthy or "unhealthy" food items not restricted by the Project.
> - Non-SNAP dollars spent to purchase food items restricted by the Project.
> - SNAP client's ability and confidence in correctly identifying food items that can or cannot be purchased with SNAP benefits during the Project.
> - The point in time in which the SNAP client became aware of the Project and how (State SNAP webpage, retail store signage, State press release, etc.).
> - Any impacts the Project potentially had on participants shopping routines (such as distance traveled to store, increase spending of non-SNAP dollars, more frequent shopping trips, etc.).

A.R. 20, 37, 59, 73–74, 96–97. They also required the states to produce quarterly reports on the "[m]onthly total number" of "compliments and complaints received" from SNAP retailers, participants, and the "advocacy, community, or retailer association groups," along with a "qualitative summary" of the feedback. A.R. 20, 37, 59, 73–74, 96–97.

While plaintiffs have voiced a number of concerns about flaws or vagueness in the states' evaluative criteria, they do reveal one thing for sure: the defendants and the states expected that the pilot programs would have a significant impact on the public. All the types of impact they sought to measure – "food purchasing and consumption behaviors," participant "spending habits," participant "health outcomes" including "the diagnosis and treatment" of certain conditions, access to the SNAP program itself – would all be significant changes to the public's behavior.

The agency's conclusion that there was no "significant impact" because the projects did not change key statutory criteria concerning eligibility or the ability to buy "staple foods," Defs.' Reply at 22, was beside the point. But even under its own standard, what the pilot projects accomplish is a significant change to the Food and Nutrition Act's statutory scheme. The projects require the federal defendants to waive the statutory definition of "food," which determines exactly what participants can and cannot buy with benefits. To use the Secretary's and the USDA's words, those waivers involve "unprecedented flexibility," and the projects are "novel" and "historic action[s]." A.R. 15, 283; *see, e.g.*, A.R. 267 (article published by the USDA titled, "Secretary Rollins Approves First Ever State Waiver to Restrict Soda and Energy Drinks from Food Stamps in Nebraska," calling the state's pilot project a "historic action").

Moreover, defendants' justification that SNAP benefits are supplemental and "calculated to cover only 70 percent of the household's monthly food budget," *see* Defs.' Cross-Mot. at 16;

Defs.' Reply at 16, does not cut against the significant impact the projects would likely have on the public. For one thing, neither the December 30 memorandum, nor government counsel could tell the Court where the seventy percent determination came from. A.R. 190; May 1 Tr. at 38:19–23 (The Court: "You say it's only supposed to cover seventy percent, and I want to know where it came from." Government counsel: "So I don't have a, sort of, behind-the curtain answer for Your Honor any more than what's already in the record."). From what the Court can tell, the seventy percent comes from section 2017(a) of the Food and Nutrition Act, which states that

> [t]he value of the allotment which State agencies shall be authorized to issue to any households certified as eligible to participate in [SNAP] shall be equal to the cost to such households of the thrifty food plan reduced by an amount equal to 30 per centum of the household's income.

7 U.S.C. § 2017(a). But just because the statute calculates SNAP benefits at a certain level of a household's income does not mean that the public would not be impacted by the pilot project restrictions in reality. As government counsel rightfully conceded, "some of our – the country's neediest citizens do rely exclusively on SNAP." May 1 Tr. 38:12–13. For those individuals, adding more items to the list of foods that cannot be purchased with SNAP benefits does not mean that the cost will shift to their own income – they will not be purchased at all. That is still significant, and it was, in fact, the goal of the projects.[11]

---

11 In their reply brief, defendants assert, for the first time, that the agency's decision not to publish notice "accords with historical practice by the agency." Defs.' Reply at 22. In support, they included the declaration of a "FNS-SNAP Retailer Policy Division Director," who stated: (cont.)

When "the agency's interpretation 'would contravene the plain text of its own regulation[],'" the Court must "reject it." *Norfolk S. Ry. Co.*, 72 F.4th at 307, quoting *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018). It will do so here. The agency's decision to circumvent the notice requirement in section 282.1(b) contravenes the plain text of that regulation because the projects were likely to significantly impact the public. Therefore, the Court owes defendants' interpretation no deference, and it finds that they violated the regulation by failing to post notice thirty days before the initiation of the projects in Iowa, Nebraska, West Virginia, and Colorado.[12]

---

> I contributed to the review and processing of other waivers for State agencies such as Colorado and Iowa's Standard Medical Deduction demonstration projects implemented in 2017 and 2020, Colorado's Job Retention Services Extension demonstration project in 2024, and Tennessee's Elderly Simplified Application Project in 2025. These demonstration projects impacted a large portion of SNAP recipients in those States and notice was not published in the Federal Register with respect to these waivers.

Decl. of Casey McConnell, Ex. 1 to Defs.' Reply [Dkt. # 28-1] ¶ 9. There are two problems with this explanation. For one thing, the explanation appears nowhere in the December 30 memorandum, or anywhere else in the administrative record, and "courts may not accept . . . counsel's *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50. Further, it could equally be true that the agency erred in failing to post notice in the declarant's list of example projects. The Court could not even begin to opine on that, though, because defendants include no explanation of what those projects entailed or how they are similar to the projects in this case.

12 Even if the agency's interpretation of section 282.1(b) survived the genuine ambiguity and reasonableness steps of the *Kisor* analysis, the Court would still find that *Auer* deference did not apply to the USDA's determination. The last step of *Kisor* says that *Auer* deference is not appropriate where the agency interpretation does not "in some way implicate [the agency's] substantive expertise," and where it does not "reflect 'fair and considered judgment.'" *Kisor*, 588 U.S. at 577, 579. It is not at all clear that the USDA used its "substantive expertise" in the December 30 memorandum, beyond just reading the Food and Nutrition Act. And notably, defendants' decision to decline posting notice was made on December 30, 2025, well after the date section 282.1(b) required them to post notice of the projects in Iowa, Nebraska and West Virginia, which was December 1, 2025. This is exactly the sort of "*post hoc* rationalization to . . . defend past agency action[]" that *Kisor* warned courts to reject. 588 U.S. at 579 (internal quotation marks and citations omitted).

Defendants in the alternative argue that "if the Court determines that USDA was required to publish the waiver approvals in the Federal Register, it should conclude that the failure to do so constitutes harmless error," and therefore, no vacatur is necessary. Defs.' Cross-Mot. at 22–23; Defs.' Reply at 23. Even when the court finds that an agency action is unlawful, section 706 of the APA requires it to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. "The most natural interpretation of" that language is that "reviewing courts should adapt the 'rule of prejudicial error' applicable in ordinary civil litigation (also known as the harmless-error rule)." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 588 (2025).

"Error is harmless when [it] . . . is one that clearly had no bearing on the procedure used or the substance of decision reached." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023) (internal quotation marks and citation omitted). In the context of the APA's statutory notice and comment requirement, the D.C. Circuit has explained that, "[g]enerally, we have not been hospitable to claims of harmless error in cases in which the government violated [section] 553 of the APA by failing to provide notice." *Id.*, quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014) (alterations and internal quotation marks omitted). "But error can be harmless if notice-and-comment would not alter the legal conclusion of the rule." *Id.*, citing *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471–72 (D.C. Cir. 2014). "Ultimately, it is the plaintiff's responsibility to show that an error is harmful." *Id.*

That burden is easily met in this case. At bottom, defendants' error was one that "clearly had . . . bearing on the procedure" they used because the error is that they skipped the procedure entirely. Plaintiffs allege that if they were given proper notice, they "would have commented on the impact the waivers have had, or will have, on them," including their specific health and

financial issues. Pls.' Opp. at 32, citing Johnson Decl. ¶ 21; Starks Decl. ¶¶ 18–19; Craig Decl. ¶ 36; Aragon Decl. ¶ 14; Fleming Decl. ¶ 18; Hoffer Decl. ¶ 16. And it is not as if the federal defendants considered those issues elsewhere in the record; there is not a single document showing that they considered the unintended negative consequences the projects could have on SNAP participants, or the need for a medical opt-out, at all.

Defendants offer three reasons as to why their failure to post notice was harmless, but none are persuasive. First, they attempt to distinguish the case from those involving the APA's statutory notice and comment requirement, as "[h]ere it is not even the APA's notice requirement that applies, which is statutory, but USDA's own regulation." Defs.' Cross-Mot. at 22. But it does not matter whether a statute or a regulation requires notice – they are both sources of law that the agency must follow, whether it wants to or not. *Nat'l Env't Dev. Assoc.'s Clean Air Project*, 752 F.3d at 1009 ("It is 'axiomatic,' . . . 'that an agency is bound by its own regulations.'").

Second, defendants argue that because the regulation "is not a notice-*and-comment* requirement, but merely a notice requirement, . . . [p]laintiffs cannot allege harm from their inability to comment . . . as they never had any right to comment." Defs.' Cross-Mot. at 22. But this ignores the fact that the applicable notice requirement is followed by several more sentences:

> If significant comments are received in response to this General Notice, the Department *will* take such action as may be appropriate prior to implementing the project. If the operational procedures contained in the General Notice described above are significantly changed because of comments, an amended General Notice *will* be published in the Federal Register at least 30 days prior to the initiation of the demonstration project, except where good cause exists supporting a shorter effective date. The explanation for the determination of good cause *will* be published with the amended General Notice. The amended General Notice *will* also explain the basis and purpose of the change.

7 C.F.R. § 282.1(b) (emphasis added). It should go without saying, but defendants are obligated to follow the mandatory obligations of section 282.1(b), which are not only notice-related but require additional procedures should the agency receive significant comments.

Finally, defendants contend that their error was harmless because "the projects were being widely publicized elsewhere." Defs.' Reply at 23. Defendants have dedicated a portion of the record to the "press releases" it published announcing the Secretary's approval of the pilot projects. *See* A.R. 267–87. But the language of section 282.1(b) calls for more than self-congratulatory press releases. It requires the USDA to publish notice "in the Federal Register," and that "[t]he notice shall set forth the *specific operational procedures* and shall explain the *basis and purpose of the demonstration project*." 7 C.F.R. § 282.1(b). The press releases do not come close to meeting that requirement, and still, the agency would have to satisfy the rest of the criteria of the regulation stated above. For all of these reasons, the Court finds that the federal defendants' error was not harmless.

**IV. The Court will not decide whether the approval of the pilot projects was arbitrary and capricious because defendants did not have authority to approve them in the first place.**

Count Two of the complaint claims that defendants acted arbitrarily and capriciously in approving the pilot projects under section 2026(b) because they did not meet the standards set by section 2026(b)(1)(A) or (B), and because they: "relied on factors which Congress did not intend them to consider, entirely failed to consider factors Congress required them to consider, offered an explanation for the decision that runs counter to the evidence, and failed to acknowledge or explain changes in agency position." Compl. ¶¶ 197. For example, plaintiffs object to the absence of an exception based on medical necessity, and they argue that approving the waiver of the statutory definition was arbitrary and capricious since the agency took the opposite position

in 2018. Pls.' Mot. at 29; Pls.' Opp. at 17. Because the Court has already found that defendants acted in excess of their statutory authority under section 2026(b), it need not decide whether their decisions were arbitrary and capricious under that statute – it was unlawful for them to apply subsection (b) in the first place, and the approvals will be vacated. If the agency decides to address medical concerns related to obesity in SNAP households through appropriate and statutorily authorized pilot programs, its action will be based on an administrative record that does not exist yet. And if access to any category of food is denied, it would be prudent to consider whether individual medical circumstances should be taken into account.

**V. The remedy is vacatur.**

The Administrative Procedure Act is clear that the "[t]he reviewing court shall . . . hold unlawful and set aside action . . . found to be . . . in excess of statutory jurisdiction . . . [or] without observance of a procedure required by law," 5 U.S.C. § 706(2), which typically occurs through a vacatur of the unlawful action and remand to the agency. But here, defendants argue that vacatur of the approvals is not necessary because "it is highly likely that the agency could substantiate its decision on remand," and vacatur would have "disruptive consequences" on the states that have already started the pilot projects. Defs.' Cross-Mot. at 26–27.

In *Allied-Signal, Inc., v. United States Nuclear Regulatory Commission*, the D.C. Circuit stated that "[a]n inadequately supported rule, . . . need not necessarily be vacated." 988 F.2d 146, 150 (D.C. Cir. 1993). But it explained that the decision on "whether to vacate depends on the seriousness of the [rule]'s deficiencies . . . and the disruptive consequences of an interim change that may itself be changed." *Id.* at 150–51 (internal quotation marks and citation omitted). So, when there is "the possibility that the [agency] may be able to justify the Rule" through further explanation on remand, and vacatur in the meantime would cause disruption,

*Allied-Signal* suggests remand without vacatur. *Id.* at 151; *see Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a decision, the first factor in *Allied-Signal* counsels remand without vacatur.").

The problem in this case, though, is not simply the absence of adequate explanation. Defendants lacked the statutory authority to approve the projects under 2026(b), so a more fulsome (*post hoc*) record cannot solve the issue, and remand without vacatur is not warranted.

At the same time, the Court will not grant plaintiffs' request to permanently "enjoin the enforcement of the waivers." Pls.' Opp. at 32–39. "Success on an APA claim does not automatically entitle the prevailing party to a permanent injunction." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020). "When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal." *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012); *Bennett v. Donovan*, 703 F.3d 582, 589 n.3 (D.C. Cir. 2013). Vacating the unlawful actions here – the Secretary and the USDA's approval of the pilot projects and the December 30 memorandum – already accomplishes what plaintiffs seek through permanent injunction. So the Court will stick with the normal procedure of vacating and remanding.

**CONCLUSION**

For the reasons stated above, plaintiffs' motion for summary judgment will be **GRANTED**, and defendants' cross-motion for summary judgment will be **DENIED**. The Secretary and USDA's approval letters, *see* A.R. 15–24, 31–48, 54–61, 69–76, 92–99, and its

December 30 memorandum regarding the notice requirement under 7 C.F.R. 282.1(b), *see* A.R. 190–92, are hereby **VACATED** and **REMANDED**.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: June 22, 2026